[S.F. No. 24184. Feb. 11, 1981.]

In re ANGELIA P., a Minor.
DEPARTMENT OF SOCIAL SERVICES,
Petitioner and Respondent, v.
RONALD P. et al., Objectors and Appellants.

COUNSEL

Joan E. Martin and Quin Denvir, State Public Defender, under appointments by the Court of Appeal, Antonia D. Radillo, Deputy State Public Defender, and Clyde Blackmon for Objectors and Appellants.

George Deukmejian, Attorney General, Thomas E. Warriner, Assistant Attorney General, and Floyd D. Shimomura, Deputy Attorney General, for Petitioner and Respondent.

Peter C. Carton, Robert H. Mnookin, Neal Snyder, Michael S. Wald, John Sullivan Kenny, County Counsel (Shasta), David R. Frank, Karen Keating Jahr and Daniel N. Frink, Deputy County Counsel, as Amici Curiae on behalf of Petitioner and Respondent.

OPINION

**RICHARDSON, J.**—What degree of proof should be required in proceedings brought under section 232, subdivision (a), of the Civil Code (all further statutory references are to this code unless otherwise cited) which describes the circumstances under which a parent-child relationship may be permanently severed? We will adopt the standard of "clear and convincing" evidence and sustain the trial court's decision to sever the relationship between the subject, Angelia P., and her parents, the appellants.

Angelia was born on September 30, 1974. On January 8, 1975, she was brought to a hospital emergency room. A medical report described her on admission as "moribund from bilateral subdural hematomas as a result of child abuse." She was suffering from a skull fracture which was diagnosed as having occurred three days to two weeks before her visit to the emergency room, and she was found to have had another, older skull fracture. As a result of irremediable brain damage caused by her injuries, Angelia required and continues to require special medical

care. She has a "shunt" implanted in her head to drain excess fluid from the brain, and must take medication in order to control grand mal seizures. She is, and is expected to remain, somewhat developmentally disabled, and requires special schooling. Angelia remained in the hospital for three months. Following the granting of a petition making her a dependent child of the court, she was then released to foster parents where she has since remained.

On November 1, 1975, Mr. P., Angelia's father, was incarcerated for a term of one to ten years following his conviction under Penal Code section 273a, subdivision (1), of wilful cruelty to Angelia. At the time of the hearing in this proceeding, his expected parole release date had been fixed as January 1979. Mr. P.'s criminal history includes convictions of burglaries and escape, and a 1966 misdemeanor conviction for battery on his eldest son, then an infant. He has an alcohol problem for which he has received no treatment, nor has he apparently received any counseling pointed at correction of his child abuse. Mr. P. denies culpability in both of the offenses for which he was convicted, and claims the children's injuries resulted from accidents. During his incarceration he failed to send Angelia any letters, cards or gifts, but prior to incarceration, he and Mrs. P. visited Angelia in her foster home. The foster parents stated that on these visits he was frequently drunk, and on one occasion had threatened them while possibly armed.

Mrs. P. is employed and resides with a younger daughter, born in August 1975. She was described by a supervising social worker as passive and dominated by her husband. Mrs. P. has regularly exchanged visits with Angelia. In 1977, at her request, a program was planned for the eventual return of Angelia to her mother's full-time custody. As the culmination of this program, the court ordered return of the child. However, in the following week after visiting her husband in prison Mrs. P. requested for the first time that the child not be returned for reasons that she described as economic. Although warned that she risked the possibility of proceedings to terminate the parental relationship, Mrs. P. persisted in her refusal to accept Angelia's immediate return.

In May 1978, the Department of Social Services (Department) filed in the Yolo County Superior Court a petition under section 232 to free the minor child from parental custody. A hearing was held in October 1978 during which appellants stated that they wished Angelia to be returned to their home gradually after Mr. P.'s release from prison.

Mrs. P., when asked whether she had any reservations about returning with Angelia to live with Mr. P. after his release, stated that she had no doubts, believing that the injuries sustained by Mr. P.'s children were accidental.

The trial court found that Angelia should be declared free from the custody and control of her parents because (1) Mr. P. had been convicted of a felony proving his unfitness to have future custody and control over Angelia (§ 232, subd. (a)(4)); (2) both parents had neglected or abused the child who had been a dependent child of the juvenile court and removed from parental custody for at least one year (*id.*, subd. (a)(2)); and (3) Angelia had been in foster care for more than two years and her natural parents were unlikely to provide a home for her, or meet the other statutory responsibilities described in subdivision (a)(7). The court specifically found that it would be in Angelia's best interests to be freed from her parents' custody and control and to her detriment to place her with either or both parents then or in the future. The court thereupon entered judgment freeing Angelia from her parents' custody and control, appointing the Director of the Department of Social Services as her guardian, and referring her to the California Adoption Service for suitable placement. Each of the parents then separately appealed.

I. BURDEN OF PROOF IN SECTION 232 PROCEEDINGS

Appellants, contending that due process requires proof beyond a reasonable doubt in section 232 proceedings, thereby raise the central issue in the case. They stress that parenting is a fundamental right, that "a section 232 proceeding involves a significant deprivation of liberty invoking the due process clause," and that, because of the liberty interest involved and the stigma attached to both parent and child when the parent-child relationship is severed, due process requires the state to meet the highest burden of proof before parental rights may be terminated. Appellants describe the adversarial interest in a section 232 proceeding as not those of parent versus child, but rather those of the family unit as opposed to the state which is "interfering with a natural and fundamental relationship."

It is undeniable that grave consequences flow from the permanent severance of the parent-child relationship. These include important financial results attending the extinction of the parent's duty to support and the mutual right to inherit. Additionally, the very essence of the

proceeding is the complete and final legal termination of a relationship which is biological in nature and most personal in form. (Mnookin, *Child-Custody Adjudication: Judicial Functions in the Face of Indeterminacy* (Summer 1975) 39 Law & Contemp. Prob. 226, 245; *In re Jacqueline H.* (1978) 21 Cal.3d 170, 175-177 [145 Cal.Rptr. 548, 577 P.2d 683].)

We have recently acknowledged that "Parenting is a fundamental right, and accordingly, is disturbed only in extreme cases of persons acting in a fashion incompatible with parenthood." (*In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514]; *In re B. G.* (1974) 11 Cal.3d 679, 688-689 [114 Cal.Rptr. 444, 523 P.2d 244].) Nonetheless, parental rights are not absolute and we must seek a consistent and reasonable approach to the varying rights involved when the state, by intervention, disturbs natural familial relationships. To that end we examine the nature of the affected rights.

Historically, the parental right or preference doctrine originated with the concept that a parent's right "in his child was akin to that of a property owner in his chattel" (*In re B. G., supra*, 11 Cal.3d at p. 694), from which it followed that the *parent's* interests in custody were of primary consideration. (See Comment, *Alternatives to "Parental Right" in Child Custody Disputes Involving Third Parties* (1963) 73 Yale L.J. 151, 155, hereinafter Yale Comment.) This principle survives, albeit in modified form, based on "the assumption that a natural parent will most adequately fulfill his child's needs." (Yale Comment, at p. 155.)

More recently the primacy of another consideration has evolved in the reasoning of courts, legislatures and commentators which have focused on the *child's* well-being, seeking to ascertain the "best interest" of and the "least detrimental alternative to the child." Our Legislature's concern is manifest in its direction that the statutes concerning the termination of parental rights "shall be liberally construed to serve and protect the interests and welfare of the child." (§ 232.5; see also Welf. & Inst. Code, §§ 302, 319.5, 328.5, 360-370; Sen. Bill No. 1726 (Presley 1980) [statutes establishing and regulating "demonstration" counties involved in innovative approaches to dealing with removal, termination, and foster care for children].)

In theory, the evolving "parental preference" and "child's best interests" standards do not necessarily conflict. As one commentator has noted, "In general, children's needs are best met by helping parents

achieve their interests. In some situations, however, there may be a conflict of interests.... In these situations, the legal system should protect the child's interests. Not only is the child a helpless party but the parents should suffer the consequences of their inadequacy rather than the child." (Wald, *State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights* (1976) 28 Stan.L.Rev. 625, 638, fn. omitted [hereinafter Wald]; Yale Comment, at pp. 155-156; see Goldstein et al., Beyond the Best Interests of the Child (1973) pp. 53-54 [hereinafter Goldstein et al.] [recommending "'the least detrimental available alternative for safeguarding the child's growth and development'" as a standard on the ground that the "best interest test" too often subordinates the child's interests to those of various adult claimants].)

The foregoing doctrinal expressions underscore the fundamental nature of the parents' custodial rights, but also qualify these rights recognizing that they do not exist in a vacuum wholly devoid of legitimate competing interests. In rejecting the argument that "proof beyond a reasonable doubt" is required when the state terminates a natural family relationship, one federal court has concisely identified these interests as follows: "the liberty and privacy interest afforded to the parents, the interest of the state, as *parens patriae*, in protecting children from harm, and finally, the often silent interest of the child." (*Sims v. State Dept. of Public Welfare, etc.* (S.D.Tex. 1977) 438 F.Supp. 1179, 1191 [three-judge court].) In *In re Carmaleta B.*, we recently noted that subdivision (a)(7) of section 232 functionally "balances the interests of the child in secure and sufficient parenting with the conjoined interests of both parent and child in preserving the familial bond." (21 Cal.3d at p. 491.)

Acknowledging the fundamental nature of the respective rights involved and that due process protection must surround their assertion and termination, what evidentiary burden will meet constitutional requirements?

Section 232, subdivisions (a)(1) through (a)(6) are silent on the requisite burden of proof, but subdivision (a)(7) referring to children who have been at least two years in foster homes specifies a "clear and convincing evidence" standard. Evidence Code section 115 states, as a generality, that unless otherwise provided the applicable standard is the *preponderance of the evidence.* Justice Harlan, in his useful concurring

opinion in *In re Winship* (1970) 397 U.S. 358, 371-372 [25 L.Ed.2d 368, 379-380, 90 S.Ct. 1068] (fns. omitted) described the nature and general utility of this standard: "In a civil suit between two private parties for money damages, for example, we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor. A preponderance of the evidence standard therefore seems peculiarly appropriate for, as explained most sensibly, it simply requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" In our view, the more serious potential consequences of a section 232 proceeding require a higher evidentiary standard than civil actions in which money damages are awarded. The conflicting interests are weightier when the result may be termination of natural parental rights.

Appellants, in turn, urge adoption of the "proof beyond a reasonable doubt" requirement which traditionally has been reserved for those cases where the unsuccessful litigant is subject to confinement or custody. "The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.' *Coffin* v. *United States* [56 U.S. 432 (1895)] at 453." (*In re Winship, supra*, 397 U.S. at p. 363 [25 L.Ed.2d at p. 375].)

In criminal proceedings, where the conflicting interests involve an individual's freedom and the state's enforcement of its criminal laws, courts have traditionally been particularly sensitive to the citizen's liberty. Again in Justice Harlan's words, "we do not view the social disutility of convicting an innocent man as equivalent to the disutility of acquitting someone who is guilty. . . . [¶] [I]t is far worse to convict an innocent man than to let a guilty man go free." (*In re Winship, supra*, at p. 372 [25 L.Ed.2d at p. 380], Harlan, J. conc.) Moreover, we have not refused to extend the "beyond reasonable doubt" test to those noncriminal situations in which a personal freedom similarly collides with the state's interest in confinement for the protection of both the public and the individual. (See, e.g., *Conservatorship of Roulet* (1979) 23 Cal.3d 219 [152 Cal.Rptr. 425, 590 P.2d 1].) Such a liberty interest is not herein presented.

Rather, as recently expressed, "the goal of [§ 232] is to promote the welfare of the child; and the state as a *parens patriae* has not only a 'compelling interest' but also has a 'duty' to sever parental bonds once a situation contemplated by the statute arises." (*In re Terry D.* (1978) 83 Cal.App.3d 890, 896 [148 Cal.Rptr. 221]; *In re Eugene W.* (1972) 29 Cal.App.3d 623 [105 Cal.Rptr. 736].) The protection which is required is for a complex group of interrelated, but perhaps conflicting, interests among which are those of (1) the parent and child in a continuing familial relationship; (2) the parent in preserving the integrity and privacy of the family unit, free of state intervention and social stigma attached to either parent or child; (3) the child in a permanent, secure, stable, and loving environment; and (4) the state in protecting the child. Weighing these competing interests, we conclude that use of a "beyond reasonable doubt" standard is not required. The proof beyond a reasonable doubt standard is inappropriate in a section 232 proceeding where the state may be an adversary to the parents but also may be a necessary champion for the child.

We conclude that findings under any subdivision of section 232 must be made on the basis of *clear and convincing evidence*. Such a test is fully consistent with the goal of section 232 to provide "the fullest opportunity to the parents for exercise of their rights not inconsistent with the ultimate best interests of the child" (*In re Carmaleta B., supra,* 21 Cal.3d at p. 492), and in harmony with the purposes delineated by the United States Supreme Court's statement in *Addington* v. *Texas* (1979) 441 U.S. 418, 423 [60 L.Ed.2d 323, 329, 99 S.Ct. 1804] that: "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' *In re Winship,* 397 U.S. 358, 370 (1970) (Harlan, J. concurring.). The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision."

"Clear and convincing" evidence requires a finding of high probability. This standard is not new. ■ We described such a test, 80 years ago, as requiring that the evidence be "'so clear as to leave no substantial doubt'; 'sufficiently strong to command the unhesitating assent of every reasonable mind.'" (*Sheehan* v. *Sullivan* (1899) 126 Cal. 189, 193 [58 P. 543].) It retains validity today. (*In re Terry D., supra,* 83 Cal.App.3d at p. 899.)

Our conclusion is further supported by a review of the decisions of other courts, as well as some of the model codes and literature which have examined this issue. California appellate decisions addressing the question have almost unanimously held that clear and convincing evidence is required before parental rights may be terminated under any subdivision of section 232. (See, e.g., *In re Sarah H.* (1980) 106 Cal.App.3d 326, 329, fn. 4 [165 Cal.Rptr. 61]; *In re David B.* (1979) 91 Cal.App.3d 184, 196 [154 Cal.Rptr. 63]; *In re Heidi T.* (1978) 87 Cal.App.3d 864, 870 [151 Cal.Rptr. 263]; *In re Cynthia K.* (1977) 75 Cal.App.3d 81, 84-85 [141 Cal.Rptr. 875].)

The Alaska Supreme Court, in *Matter of C.L.T.* (Alaska 1979) 597 P.2d 518, rejected a constitutional challenge to the analogous Alaskan statutory scheme in a persuasive example of the decisions of sister states. Concluding that clear and convincing proof was the appropriate standard, the Alaskan court noted that "This evidentiary standard balances the competing interests involved in a proceeding brought to terminate parental rights, one of which is the right of a *child* to an adequate home. Appellant all but ignores this interest. When a petition is brought to terminate an individual's parental rights based upon alleged child abuse, the child's interests do not necessarily coincide with the parent's interest in continuation of the family unit. While appellant's standard would give the parent even greater due process protection, it would simultaneously decrease the ability of the state to protect the rights of the child." (P. 526, fns. omitted; see also, *In Interest of Atwood* (1978) 2 Kan.App.2d 680 [587 P.2d 1, 2]; *In Interest of Massey* (1976) 35 Ill.App.3d 518 [341 N.E.2d 405, 407]; *In re Sego* (1973) 82 Wn.2d 736 [513 P.2d 831, 833]; *Alsager* v. *District Court of Polk City, Iowa* (S.D.Iowa 1975) 406 F.Supp. 10, 25; *Sims* v. *State Dept. of Public Welfare, etc., supra,* 438 F.Supp. at p. 1194, and the cases cited in 59 Am.Jur.2d, Parent and Child, § 27, pp. 112-113, and 67A C.J.S., § 37, p. 274; cf., *Matter of Five Minor Children* (Del. 1979) 407 A.2d 198 [preponderance of the evidence standard applies in termination proceedings].)

Similarly, Stanford N. Katz, author of a Model Act to Free Children for Permanent Placement under a grant from the Department of Health, Education and Welfare, proposed a clear and convincing standard, noting that "Since the overriding consideration in termination proceedings is the welfare of the child, the fault or guilt of the parents is not a central focus. Thus, the standard of beyond a reasonable doubt

used in the criminal process was deemed inappropriate for these proceedings. The preponderance of the evidence standard, used in some civil proceedings, was rejected because this lesser test would make it too easy for the state to separate a child from its parents." (Katz, *Freeing Children for Permanent Placement Through a Model Act* (1978) 12 Fam.L.Q. 203, at p. 240; see also Institute of Judicial Administration, ABA Project on Standards for Juvenile Justice, Stds. Relating to Abuse and Neglect (Tent. Draft 1977) stds. 8.3, 8.4, pp. 154-161 [for children maintained in placement out of the home for the specified period the court *shall* order termination unless it finds by clear and convincing evidence that an exception as provided in the proposed scheme exists].) In candor, we must acknowledge the existence of at least one model statute developed by the National Council of Juvenile Court Judges (Fam. L. Rep., Reference File, p. 201:0070) as cited in *Matter of Five Minor Children, supra,* 407 A.2d at page 200, which recommended the more lenient preponderance of the evidence test.

In only one instance have we found the application of proof beyond a reasonable doubt in a parental rights setting. In the Federal Indian Child Welfare Act of 1978, Congress required the establishment of proof beyond a reasonable doubt before parental rights could be terminated. It has been suggested that the legislative establishment of the higher standard of proof was a response to a particular problem. "In passing the Act, Congress recognized that current state standards and procedures were leading to the wholesale destruction of Indian families and the unwarranted removal of Indian children from their homes." (Miles, *Custody Provisions of the Indian Child Welfare Act of 1978: The Effect on California Dependency Law* (1979) 12 U.C. Davis L.Rev. 647, 655, fns. omitted.)

Initially, our own Legislature provided that the standard of proof in proceedings brought under section 232, subdivision (a)(7), should be proof beyond a reasonable doubt, but as noted in *In re Lynna B.* (1979) 92 Cal.App.3d 682 [155 Cal.Rptr. 256], "Civil Code section 232, subdivision (a)(7) was amended in 1976 to substitute 'by clear and convincing evidence' for 'beyond a reasonable doubt.' It was amended again in 1977, to become operative July 1, 1978, to change the burden of proof back to 'beyond a reasonable doubt.' However, an urgency measure was enacted in 1978 again amending the statute, operative July 1, 1978, to provide for the 'clear and convincing evidence' standard [which remains the present test]. (Stats. 1978, ch. 429, § 23; ch. 1269 §§ 1-3.)" (P. 694, fn. 2.)

The several statutory changes in the standard represent a clear legislative assertion of a right to establish such a test. There is authority for the Legislature's exercise thereof because "Here we are in the arena of policy, but not properly judicial policy. . . . [T]hese are social problems which the Legislature has attempted to deal with over the years as it deems best, attempting to balance the interest of the children with that of the parents." (*In re Terry D., supra*, 83 Cal.App.3d at p. 897.)

█ Use of the "clear and convincing evidence" standard of proof fairly protects the interests represented in proceedings brought under any subdivision of section 232, and we turn to appellants' remaining contentions.

## II. EXCLUSION OF EVIDENCE REGARDING APPELLANTS' OTHER CHILD

█ The appellants assert that the trial court erred in excluding testimony concerning Mrs. P.'s kindly treatment of appellants' younger daughter, Lisa. After hearing preliminary testimony proffered by appellants regarding Lisa's general well-being in the care of her mother, the court ruled that further evidence regarding Lisa was irrelevant. Appellants argue that the evidence should have been admitted as "relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

It is true that "an order to free a child from parental custody and control must rest on present circumstances as well as past acts although such prior acts are evidence which may be considered by the court in deciding whether there is sufficient showing to justify the order." (*In re Carmaleta B., supra*, 21 Cal.3d, at p. 493.) However, a trial court has wide discretion in determining the relevancy of the evidence. (*Larson v. Solbakken* (1963) 221 Cal.App.2d 410, 420 [34 Cal.Rptr. 450].) No issue regarding appellants' treatment of Lisa had been raised by any pleading in the case, nor did the Department assert that Mrs. P. had physically abused Angelia directly.

Evidence regarding Lisa therefore was of doubtful relevance. It was undisputed that Lisa received adequate care during the period when Mr. P., who had actively abused Angelia, was absent from the home. The primary question presented at the hearing was whether section 232 applied to appellants' treatment of *Angelia*. The trial court here was well within its discretion in refusing to admit the proffered evidence.

## III. Failure to Consider Alternate Care

Appellants argue that the trial court failed to consider alternate care plans for Angelia before terminating the parent-child relationship. Specifically, they contend that the court should have considered the possibility of maintaining the status quo until Mr. P. could obtain counseling and reestablish himself following his release from prison.

In *In re David B.* (1979) 91 Cal.App.3d 184 [154 Cal.Rptr. 63], the court noted that "It is well recognized that before the parental relationship may be permanently severed, the trial court should consider the availability of less severe alternatives designed to keep the family intact." (P. 198.) However, when such services have not been offered, "the decision as to whether the services should be ordered and the proceeding delayed until the results are evaluated lies within the sound discretion of the superior court." (*In re Susan M.* (1975) 53 Cal.App.3d 300, 311 [125 Cal.Rptr. 707].) Both the foregoing general principle and its important qualification are sound.

In *In re Carmaleta B., supra,* we emphasized that section 232, subdivision (a)(7), "has the added advantage of permitting the parents a longer period, two years, in which to rehabilitate themselves to a position whereby they can properly support this most fundamental responsibility. Such an accommodation, inherent in the structuring of section 232, affords the fullest opportunity to the parents for exercise of their rights not inconsistent with the ultimate best interests of the child." (21 Cal.3d at pp. 491-492.)

Here the trial court properly considered alternatives and was fully free to decide that termination was appropriate. Angelia had been in foster care for almost *four years*, yet her parents, after having rejected an earlier return, requested an even further delay until some uncertain future date when, if all went well, Angelia could be returned to them. Such uncertainty conflicts with the intent of section 232 to afford children during their formative years a permanent, secure, and stable environment. (*In re Lynna B., supra,* 92 Cal.App.3d at pp. 698-699; *In re David B., supra,* 91 Cal.App.3d at p. 195; see generally Goldstein et al. and Wald.)

IV. SUFFICIENCY OF THE EVIDENCE

Appellants argue insufficiency of the evidence. ■ We apply, with appropriate modifications, our holding in *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738], made in accordance with *Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781]: "the [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find [that termination of parental rights is appropriate based on clear and convincing evidence]." (See *In re Marcos S.* (1977) 73 Cal.App.3d 768, 781 [140 Cal.Rptr. 912], quoting *Garrett* v. *Duncan* (1959) 176 Cal.App.2d 296, 298-299 [1 Cal.Rptr. 461], and cases cited therein.)

■ The record demonstrates that substantial evidence supports the trial court's action under several provisions of section 232. Subdivision (a)(2) permits termination if a child has "been cruelly treated or neglected by either or both of his parents, if such person has been a dependent child of the juvenile court" and the child has been removed from parental custody for at least one year. The trial court found that Mrs. P., "a very passive person, has repeatedly failed to protect or look after the best interest of the minor child." Mrs. P.'s challenges to these findings lack merit. Mrs. P., on a continuing basis, failed to protect Angelia while she was in the home. Her firm intention to reunite with Mr. P. upon his release made her passive relationship to her husband relevant to the issue of Angelia's care. In a similar context in *In re Carmaleta B., supra,* we noted that the mother's testimony "that she never feared for the safety of the children around their father, a convicted sex offender, may have properly convinced the trial court that Mrs. B. did not appreciate the necessity of keeping the children apart from Mr. B. and therefore could not be relied upon to live away from him if the children were returned to her care." (21 Cal.3d at pp. 494-495; see *In re Jacqueline H.* (1979) 94 Cal.App.3d 808, 817 [156 Cal.Rptr. 765] [court could consider child's fear of stepfather in determining quality of care mother would provide for child].)

Child abuse includes more than a parent's physical abuse. In a given case, as here, the term may involve a failure to protect the child from harm caused by others.

The trial court correctly applied subdivision (a)(7), which requires findings that the parent has failed and will fail to provide an adequate home for and parental relationship with the child, and that the child's return to the parent will be detrimental to the child. The court concluded that "The basic factors which led to the original child abuse have not changed. Moreover, based on the past and present conduct of the parents...it is likely that the parents will continue to fail, as in the past, to provide their permanently damaged child with an adequate home, care and control, parental relationship and continuous contact that the child needs."

As we have noted, "Past conduct is relevant on the issue of future fitness, although it is of course not controlling." (*In re Terry D., supra*, 83 Cal.App.3d at p. 900.) Under the circumstances of this case, the trial court could conclude that the dominance of Mr. P. and Mrs. P.'s failure to protect Angelia from Mr. P., and the consequences flowing therefrom fully justify the order of termination.

It is significant that Mr. P. has not challenged the trial court's ruling under subdivision (a)(4) of section 232, which permits termination on a finding that a parent was convicted of a crime of a type tending to prove the parent's unfitness to have care, custody and control of his child. On this basis alone, the court's judgment terminating Mr. P.'s rights is sustainable. (See, e.g., *In re Geoffrey G.* (1979) 98 Cal.App.3d 412 [159 Cal.Rptr. 460]; *Adoption of D. S. C.* (1979) 93 Cal.App.3d 14 [155 Cal.Rptr. 406].)

Finally, substantial evidence also supported the finding as required by *In re Carmaleta B., supra*, 21 Cal.3d at pages 495-496, that return of Angelia to her parents would be detrimental to her interests, pursuant to the more general provisions of section 4600. (See *In re B. G., supra*, 11 Cal.3d at p. 683.)

V. INTRODUCTION OF MR. P.'S PROBATION REPORT

Early in the proceedings, Department's attorney requested the court to take judicial notice of the 1975 superior court proceedings in which Mr. P. had been convicted of child abuse on Angelia. Thereafter, at the close of the evidence, in response to an inquiry from the court, the clerk stated that the record, except for the probation report, was available, and that the probation report which was not in the file was being

brought up. The court then stated "We'll take a short recess then, and I'll read that." No objection was made. (See Evid. Code, § 353.)

■ Appellants now contend that the court's consideration of the report was erroneous because it was hearsay, that appellants were denied an opportunity to object, and alternatively that the failure to object demonstrated that their appointed counsel provided ineffective assistance. We are unpersuaded.

In arguing that they had no chance to object, appellants ignore the opportunity afforded to them when the court recessed to consider the report and also at the point when Department's attorney first requested the court to take judicial notice of the criminal proceedings.

Next, assuming arguendo that the report was hearsay, counsel's failure to object did not indicate inadequate representation even under the standards urged by appellants. Mr. P.'s criminal history was part of the probation officer's report prepared under section 233 which provides that the juvenile probation officer "*shall* render to the court a written report of the investigation with a recommendation.... The court *shall* receive such report in evidence and *shall* read and consider the contents thereof in rendering its judgment." (Italics added.) It has been held that "the written report mandated by the statute is admissible over a general hearsay objection so long as a meaningful opportunity to cross-examine and to controvert the content of the report is afforded." (*In re Heidi T.* (1978) 87 Cal.App.3d 864, 875 [151 Cal.Rptr. 263]; *In re George G.* (1977) 68 Cal.App.3d 146, 155-156 [137 Cal.Rptr. 201].)

Appellants had such an opportunity to cross-examine the probation officer who prepared the report and to produce any controverting evidence. They did not refute the evidence thus presented. The information contained in the probation report was therefore cumulative of similar information presented in the section 233 report and admission of the evidence was harmless.

■ The failure of counsel to object did not reflect any lack of competence, because, faced with his adversary's request for the court to take judicial notice, counsel could well have concluded that it was better to permit admission of the report rather than to risk presentation of in-court testimony from other witnesses whose adverse testimony may

have been more damaging. This would have been an informed tactical decision.

## VI. CONCLUSION

We conclude that the trial court was correct in terminating the parental rights of appellants. Although, understandably, it did not expressly articulate its use of the appropriate standard of proof, it properly applied a test of clear and convincing evidence.

We find no merit in appellants' other contentions.

·The judgment is affirmed.

Tobriner, J., Mosk, J., and Clark, J., concurred.

**BIRD, C. J.,** Concurring and Dissenting.—I respectfully dissent from the majority opinion insofar as it sanctions the irrevocable termination of this mother-daughter relationship which the record indicates and the state's attorney conceded was a loving and caring one. Further, a finding that the mother was "too passive" in her relationship with her husband and the use of this finding to justify severance of the parent-child relationship raises some serious questions in a pluralistic society where the relationship between husband and wife may vary according to cultural background. Is there now to be a judicially determined norm?

It is also disturbing that this court would allow the fact that Angelia's mother worked outside the home to be used as evidence favoring termination. These holdings raise some questions as to (1) whether there are to be any real limits placed on the state when it seeks to sever a parent-child relationship, and (2) whether our system lacks sensitivity to the problems of poor working women.

It is important to remember that this court is sanctioning the termination of any contact between this mother and daughter for the rest of their lives. This is not a question involving who should have the custody of this child. This parent will lose all rights to visitation and to attempt to regain custody at some future time. (See *In re Jacqueline H.* (1978) 21 Cal.3d 170, 175-176 [145 Cal.Rptr. 548, 577 P.2d 683]; *In re*

*Robert P.* (1976) 61 Cal.App.3d 310, 318 [132 Cal.Rptr. 5].) This minor child loses the right to support from her parents, and to any inheritance from the biological family members. (Maj. opn., *ante*, at p. 915.)

The granting of a petition for severance of parental rights under Civil Code section 232 results in a *complete* and *irrevocable* break in the bond between parent and child. The trial court's order and judgment granting such a petition is conclusive and binding. Once made, the trial court is without power to set aside, change, or modify it. (Civ. Code, § 238.) There is no right to any further contact or communication between biological parent and child. For all practical purposes, a termination order has the same effect as the death of a child for a parent and the death of a parent for a child because the consequences are as final and irrevocable.

In order to sever the parent-child relationship under section 232, proof of a statutory ground and detriment to the child[1] if the child is immediately returned to the custody of the parent are not the only prerequisites. The trial court must also determine that termination is the *least detrimental alternative for the child.*

The Legislature in 1965 enacted section 232.5,[2] which stated: "The provisions of this chapter shall be liberally construed to serve and protect the interests and welfare of the child." The addition of section 232.5 was quickly understood to require consideration of the best interest and welfare of the child in section 232 termination proceedings. (*In re Neal* (1968) 265 Cal.App.2d 482, 490 [71 Cal.Rptr. 300].) This court recognized this principle in our review of a section 232 proceeding in *In re Carmaleta B., supra,* "...we must determine if the trial court's findings under subdivisions (a)(2) and (a)(6) were supported by sub-

---

[1]Civil Code section 4600, subdivision (c) requires: "Before the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child."

A section 4600 finding of detriment has been required in termination proceedings. (*In re Carmaleta B.* (1978) 21 Cal.3d 482, 496 [146 Cal.Rptr. 623, 579 P.2d 514] and cases cited.)

All references will be to the Civil Code unless otherwise indicated.

[2]Statutes 1965, chapter 1064, section 1, page 2710.

stantial evidence such that the situation contemplated by the statute arises, *and severing the parental relationship becomes the least detrimental alternative for the children.* [Citations.]" (21 Cal.3d at p. 489, italics added.)[3]

The requirement of a finding that termination is in the best interest of the child, or the more precise formulation articulated in *In re Carmaleta B., supra,* that it is the least detrimental alternative available, is also compelled by principles of substantive due process. "Substantive due process prohibits governmental interference with a person's fundamental right to life, liberty or property by unreasonable or arbitrary [state action]." (*In re David B.* (1979) 91 Cal.App.3d 184, 192-193 [154 Cal.Rptr. 63] citing 13 Cal.Jur.3d, Constitutional Law, § 364, pp. 676-677 and other sources.)

A parent's interest in the care, custody and companionship of a child is a fundamental liberty, among our most basic civil rights. (*Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558-559, 92 S.Ct. 1208]; *In re Carmaleta B., supra,* 21 Cal.3d at p. 489; *In re B. G.* (1974) 11 Cal.3d 679, 688 [114 Cal.Rptr. 444, 523 P.2d 244].) Therefore, only a compelling state interest may justify the deprivation of this most fundamental right. (See *Roe* v. *Wade* (1973) 410 U.S. 113, 155 [35 L.Ed.2d 147, 178, 93 S.Ct. 705].) The state interest asserted in termination actions is the prevention of harm to the child. (*In re David B., supra,* 91 Cal.App.3d at p. 196.) These relevant constitutional principles were considered in the recent case of *In re David B., supra.* The court concluded that, even if a statutory ground for termination under section 232 is established by clear and convincing proof, termination comports with substantive due process *only if* the trial court finds, inter alia, "that the immediate severance of the parental relationship is the *least detrimental alternative* available to protect the welfare of the child." (*In re David B., supra,* 91 Cal.App.3d at p. 196.) Therefore, the state must prove in each individual case that there is a sufficiently compelling state interest, in terms of providing a less detrimental alternative to the parent-child relationship, to justify the deprivation of liberty that termination entails.

[3]Amici Alameda County Social Services Agency et al., who generally support the Attorney General's position in this case, concede the statutory requirement for the finding that termination is in the best interest of the child. Brief of amici Alameda County Social Services Agency et al., at pages 21-22.

Whether denominated a statutory or constitutional right, the requirement that termination of the parental relationship be the least detrimental alternative to the child is based on sound policy. It is an unfortunate truth that not all children, who are "freed" from their legal relationship with their parents, find the stable and permanent situation that is desired even though this is the implicit promise made by the state when it seeks to terminate the parent-child relationship.[4] Multiple placements and impermanent situations sometimes mark the state's guardianship of a child. This unstable situation is frequently detrimental to a child. Indeed, the detriment may be greater than keeping the parent-child relationship intact since the child's psychological and emotional bond to the parent may have been broken with nothing substituted in its place.[5]

In the instant case, the trial court had two alternatives available after it made the finding of detriment to the child if she were immediately released to her mother's custody. The petition of the state to terminate the mother's relationship with the child could have been denied. This would have permitted the noncustody relationship to continue while the child remained in foster home placement. Alternatively, the legal relationship could have been terminated and the child placed in the custody of the state. A review of the evidence shows conclusively that the state failed to carry its burden of showing by clear and convincing evidence[6] that immediate termination of the noncustody parent-child relationship was the less detrimental alternative.

---

[4]See Department of Social Services, Foster Care Services, Selected Characteristics October 1979 Survey. The survey states that of those children in foster care who have had formal adoptability determinations (about one-third of all children in foster care) less than half were found to be either immediately or potentially adoptable. (*Id.*, at p. 2.)

Of the children in foster care who have been relinquished for adoption (either through consent of the parents or termination of parental rights pursuant to § 232), 40.3 percent have been in foster care more than 3 years since relinquishment and 18.5 percent have been in foster care 11 years or more since relinquishment. (*Id.*, at p. 57.)

[5]"There are at least two ways a child might be harmed by termination. First, if a child is attached to her parents, termination may harm the child by preventing continued contact after placement." Wald, *State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights* (1976) 28 Stan.L.Rev. 625, 672 (hereinafter Wald).

"A child may also be harmed by termination if she cannot be placed permanently following termination." (*Id.* at p. 673.)

"Thus, termination may leave a child truly in limbo." (*Id.*, at p. 674.)

[6]The clear and convincing standard is the appropriate standard of proof on this issue, given the "nature of the affected rights." (Maj. opn., *ante*, at p. 916.)

Viewing the entire record in the light most favorable to the judgment below, there was not substantial evidence by clear and convincing proof that the termination was in the best interest of the child. (Cf. *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)

In reviewing the record on this issue, one is struck by the *lack of evidence.* For instance, although Angelia had the benefit of conscientious and caring foster parents after her removal from her parents' custody, there was *no evidence* offered as to whether the foster parents desired to adopt Angelia. The only evidence regarding Angelia's future, if termination were granted, was that the California Adoption Service would try to seek adoptive placement. No evidence was offered regarding the possibility or probability that adoption would occur.[7]

On the other hand, substantial evidence of Mrs. P.'s close, loving, and regular relationship with Angelia was presented. Mrs. P. visited Angelia regularly in the foster home. So positive was the relationship that the foster parents encouraged Mrs. P. to resume custody as they felt Mrs. P. could adequately care for Angelia, although they were apprehensive about Mr. P.'s return. The trial judge specifically stated that: "[t]here appears to be no impediment of any kind in this normal love which this mother has for this child...." The Attorney General stated at oral argument that it was undisputed that there was a bond of affection between mother and child.

On this record, I cannot agree that there is substantial evidence that termination of any relationship between Angelia and Mrs. P. is in the best interests of this child. Angelia's present situation is one in which

---

[7]Both the Attorney General and amici Alameda County Social Services ,Agency et al., concede that the outlook for adoption is a factor which should be taken into account in ascertaining the child's best interest at termination proceedings. The brief of amici Alameda County Social Services Agency et al., authored by Professor Wald, states:

"The Court of Appeal seemed [in its opinion in this case], however, to be concerned that terminations might occur without a guaranteed adoption. This is certainly a relevant factor for trial courts to consider in deciding whether, in any given case, granting termination is in the child's best interest. If there is little or no chance of providing the child with a permanent home, termination may be inappropriate. Amici believe that trial courts ought to determine the likelihood that the child will be adopted or otherwise permanently placed before deciding whether to terminate parental rights.

"However, the prior availability of an adoptive home is not a prerequisite for a 232 proceeding." (Brief of amici Alameda County Social Services Agency et al., at pp. 23-24.)

she has the benefit of a good foster home and the regular visitation from and emotional bond with her natural mother.[8]

The alternative presented by the state is ephemeral at best. This case is similar at least in this respect to the situation confronted by the Court of Appeal in *Adoption of Michelle T.* (1975) 44 Cal.App.3d 699 [117 Cal.Rptr. 856, 84 A.L.R.3d 654]. There, the court stated: ". . . the alternative presented is commitment of the child to the Department [State Department of Health] in order that 'adoptive or other suitable plans' may be arranged. While we recognize the difficulty the Department would have in submitting more definite plans, we conclude that the alternative presented places the court in a difficult position." (*Id.* at p. 707.) The Court of Appeal was rightly concerned in *Michelle T.* that denial of the foster parents' petition for adoption in that case in favor of granting the state's petition for commitment of the child to the Department's care would "set her adrift in a sea of bureaucratic uncertainty. In such a situation, T. may bounce from one foster home to another before final placement sometime hence." (*Id.*, at p. 708.)

In the instant case, there was no evidence of prospects for the adoption of Angelia, who is still disabled from the injuries she suffered as an infant. There were no indications from the current foster parents of any desire to adopt Angelia. While there is much evidence that extended foster home care may be harmful to a child,[9] the harm is predicated on the child's need for permanence and stability, and on the necessity for an emotional bond between the developing child and a responsible adult. In the instant case, the only evidence of any emotional bond on the part of Angelia is to her natural mother.[10] Had substantial evidence been presented that continuation of the present relationship was harmful, the least detrimental alternative test would have been satisfied. No such evidence was presented.

Also, I respectfully dissent from that portion of the majority opinion which upholds the trial court ruling disallowing any evidence of Mrs.

---

[8]"A child may even benefit from having two sets of 'parents,' especially in situations where the natural parents visit frequently." (Wald, *supra*, 28 Stan.L.Rev. at p. 672.)

[9]See Wald, *supra*, 28 Stan. L.Rev. at pages 644-646 and sources cited; Goldstein et al., Beyond the Best Interest of the Child (1973).

[10]Contrast *In re D.L.C.* (1976) 54 Cal.App.3d 840 [126 Cal.Rptr. 863], where evidence was presented that the foster parents had developed a parent-child relationship with the child and were the "psychological parents." (*Id.*, at p. 845.)

P.'s good care of Angelia's sibling Lisa. This evidence was not irrelevant to the issues framed by the allegation under section 232, subdivision (a)(7) that Mrs. P. had failed and was likely to fail in the future, to provide a home, care and control for Angelia and a proper parental relationship. The majority concede that an examination of the present circumstances of the parent is required in section 232 proceedings. (Maj. opn., *ante*, at p. 922.) The present ability of Mrs. P. to provide a home, care and control for three-year-old Lisa, and to maintain an adequate parental relationship with her meets the test of relevancy, which is simply whether the evidence has any tendency in reason to prove a disputed fact. (Evid. Code, § 210.)

Mrs. P.'s parenting capabilities with respect to the child that is in her custody bear a reasonable relation to the disputed issue of whether she is capable of providing the physical and emotional necessities which Angelia requires. Certainly, any evidence of failure to provide Lisa with a home, care and control would be highly probative evidence of her likely future failure to provide the same to Angelia, and would be admissible. Why the converse is not true is left unexplained by the majority.

Proof that a child, who has remained in parental custody, has received adequate parenting is the strongest type of rehabilitative evidence that a parent can present. To permit a trial court in its discretion to ignore such evidence is to limit those parents who seek to disprove unfitness allegations to proof of good intentions only. Evidence of their good actions as demonstrated in interaction with their other children, who are at home, is excluded. While the proferred evidence was not conclusive, and its effect may have been blunted by other evidence, its tendency to prove Mrs. P.'s future ability to provide a home, care and control for Angelia is clear.

The majority seek to exclude the evidence by defining the only disputed issue in this case as "whether section 232 applied to appellants' treatment of Angelia." (Maj. opn. at p. 922.) The allegations of section 232, subdivision (a)(7), as the majority later recognize (maj. opn. at p. 925), require findings of past and the probability of future failure to provide an adequate home, care and custody. Therefore, issues other than the past treatment of Angelia were before the trial court. It is on these issues of the future capability of Mrs. P. to provide Angelia with an adequate parental relationship that the evidence of Mrs. P.'s good

parenting of Lisa had strong probative value and should have been admitted.

Based on this inadequate record, I would reverse the termination of the child-parent relationship between Angelia and her mother.

Newman, J., concurred.