[No. F005934. Fifth Dist. Apr. 30, 1986.]

In re AMIE M., a Minor.
DEPARTMENT OF SOCIAL SERVICES, Petitioner and Respondent, v.
LINDA M., Objector and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.

COUNSEL

Paula F. Schmidt, under appointment by the Court of Appeal, for Objector and Appellant.

John K. Van de Kamp, Attorney General, Elisabeth C. Brandt and Carol P. Wallacker, Deputy Attorneys General, for Petitioner and Respondent.

Marisa Nayfach, under appointment by the Court of Appeal, for Minor.

OPINION

**FRANSON, Acting P. J.—**

STATEMENT OF THE CASE AND FACTS

This is an appeal from a judgment granting a petition by the State Department of Social Services (respondent) to terminate appellant's parental rights in her daughter, Amie M., pursuant to Civil Code section 232, subdivisions (a)(6) and (7).[1]

Appellant has suffered an extensive history of mental illness, first diagnosed in 1978, and has been under a conservatorship periodically since 1979. She has been diagnosed as suffering from a schizophrenic disorder. Examples of her symptomatology abound in the record. For example, she refused to acknowledge her pregnancy with Amie, attributing her expanding abdomen to overeating or bathing, and apparently believed her abdomen contained a dog and cat; she accused her sister and brother-in-law of being ghosts; she appeared at her sister's home late at night expressing fears that her son, then in her sister's custody, had drowned in a canal; she believed she had set fire to the world with a cigarette; she thought sewer lines were

---

[1]Civil Code section 232, subdivision (a)(6) authorizes termination of parental rights under specified conditions to a person "[w]hose parent or parents are mentally disabled." "Mentally disabled" means "any mental incapacity or disorder which renders the parent or parents unable to adequately care for and control the child."

Civil Code section 232, subdivision (a)(7) authorizes termination of parental rights to a person "[w]ho has been in out-of-home placement under the supervision of the juvenile court, the county welfare department, or other public or private licensed child-placing agency for a one-year period, if the court finds that return of the child to the child's parent or parents would be detrimental to the child and that the parent or parents have failed during that period, and are likely to fail in the future, to maintain an adequate parental relationship with the child, which includes providing both a home and care and control for the child."

All statutory references are to the Civil Code unless otherwise noted.

connected to her kitchen sink. She has been hospitalized seven times since 1978 for her condition.

Appellant's sister, Nancy M., visited appellant and her boyfriend at appellant's apartment in November 1982. She observed appellant to be approximately six months pregnant, although both appellant and her boyfriend denied the pregnancy. She further observed that appellant was severely malnourished. Appellant told her sister that she had gone off her medication.[2]

Nancy M. returned to appellant's apartment several days later with a mental health worker and a police officer, and appellant was immediately hospitalized. Appellant was not released from the hospital until her daughter Amie was born on February 23, 1983.

Amie was taken into custody on the date of her birth by the Stanislaus County Department of Human Services, and two days later human services petitioned the juvenile court to declare Amie a dependent child under Welfare and Institutions Code section 300, subdivision (a). On February 28, 1983, the juvenile court issued an order of detention placing Amie in a receiving home.

On April 25, 1983, the juvenile court granted the petition, declaring Amie to be a dependent child under Welfare and Institutions Code section 300 and advising all parties that unless reunification efforts were effected within six months, action might be taken to permanently free Amie from the custody and control of her parents under section 232. On September 26, 1983, the juvenile court found that reunification had not been effected and was unlikely in the next six months and approved filing of a section 232 action by the welfare department.

On March 12, 1984, the juvenile court continued the matter until September 4, 1984, directing that reunification efforts be continued during that time. On September 4, 1984, the court determined that reunification had been unsuccessful and that long-term placement was necessary and directed the filing of a section 232 petition.

On October 30, 1984, respondent filed its petition in the action below to free Amie from the custody and control of her mother.[3] Counsel was appointed for mother and daughter, and the matter went to hearing December 19, 1984.

---

[2]At the time, appellant's prescribed medications included Navane and Benadryl. Subsequent treatment included lithium carbonate and Artane.

[3]Petitioner also sought to free Amie from custody and control of her father, Charles C. Mr. C. fought the petition below and lost. No appeal was taken.

On April 24, 1985, the court below severed appellant's right to the custody and control of her daughter.

DISCUSSION

I.

*The standard under section 232, subdivision (a)(6).*

Prior to its last major revision in 1983, section 232, subdivision (a)(6) provided that an action may be brought to declare a minor free from the custody and control of a parent when the child's "parent or parents are, and will remain incapable of supporting or controlling the child in a proper manner because of *mental deficiency or mental illness,* if there is testimony to this effect from two physicians and surgeons each of whom must have been certified either by the American Board of Psychiatry and Neurology or under Section 6750 of the Welfare and Institutions Code or licensed psychologists who have a doctoral degree in psychology and at least five years of postgraduate experience in the diagnosis and treatment of emotional and mental disorders. . . ." (Italics added.)

In using the terms "mental deficiency or mental illness" in section 232, the Legislature incorporated by reference the definitions of those terms contained in former sections 5590 and 5550 of the Welfare and Institutions Code. (*In re Baby Boy T.* (1970) 9 Cal.App.3d 815, 820 [88 Cal.Rptr. 418]; *In re Carmaleta B.* (1978) 21 Cal.3d 482, 490 [146 Cal.Rptr. 623, 579 P.2d 514].) Thus, "mentally ill persons" were defined as "'persons who come within either or both of the following descriptions: (a) Who are of such mental condition that they are in need of supervision, treatment, care or restraint. (b) Who are of such mental condition that they are dangerous to themselves or to the person or property of others, and are in need of supervision, treatment, care or restraint.'" (*In re Baby Boy T., supra,* 9 Cal.App.3d at p. 820; *In re David B.* (1979) 91 Cal.App.3d 184, 193 [154 Cal.Rptr. 63].)

In 1983, section 232, subdivision (a)(6) was redrafted to eliminate the terms "mental deficiency" and "mental illness." That subdivision now applies to minors "[w]hose parent or parents are *mentally disabled* and are likely to remain so in the foreseeable future. As used in this subdivision, 'mentally disabled' means that a parent or parents suffer any mental incapacity or disorder which renders the parent or parents unable to adequately care for and control the child. . . ." (Italics added.)

In so removing the terms "mental deficiency" and "mental illness" from the text of subdivision (a)(6) and replacing them with the expressly defined

term "mentally disabled," the Legislature presumably intended to ease the evidentiary burdens of the petitioners in actions under section 232, subdivision (a)(6). No longer is it necessary to demonstrate the need of supervision, treatment, care or restraint, or to show that the parent is dangerous to himself or to others; the statute now expressly includes "*any* mental incapacity or disorder which renders the parent or parents unable to adequately care for and control the child." (Italics added.) The focus of the statute has thus been shifted from the parent's mental illness to the needs of the child, where it assertedly belongs. "The purpose of this chapter is to serve the welfare and best interests of a child by providing the stability and security of an adoptive home when those conditions are otherwise missing from his or her life. . . ." (§ 232.6.)

In *In re Carmaleta B., supra,* 21 Cal.3d 482, decided under the prior version of section 232, subdivision (a)(6), the Supreme Court rejected the proposition that the definition of "mental illness" created by case law was inconsistent with "the implications of sections 232.5, 237, and 232, subdivision (a)(7), emphasizing the welfare of the child." (*Id.,* at p. 490.) A broader definition of "mental illness" proposed in an amicus brief, which would have included situations "where the parents are demonstrably incapable of providing proper care but are nevertheless not so incapacitated as to require '. . . supervision, treatment . . . or restraint'" (*id.,* at p. 491), was deemed unnecessary to achieve the purpose of the statute, the court noting that "we should not, *in the absence of language clearly expressing such a standard,* so interpret the statute." (*Id.,* at p. 492, italics added.)

The new language of subdivision (a)(6) does clearly express such a standard. ■ "It is . . . the rule that an amendment materially changing a statute following a court decision interpreting the statute in its original form is to be regarded as an indication of legislative intent to change the meaning of the law. [Citation.]" (*Verreos* v. *City and County of San Francisco* (1976) 63 Cal.App.3d 86, 99 [133 Cal.Rptr. 649].) ■ Thus the definition of "mental illness" formulated in *In re Baby Boy T., supra,* 9 Cal.App.3d 815 and its progeny does not apply to cases arising under the new version of section 232, subdivision (a)(6). Under the new statute, all that is required is that the state prove that the minor's parent is mentally disabled, i.e., suffers a mental incapacity or disorder which renders the parent unable to adequately care for and control the child and which is likely to continue in the foreseeable future.

II.

*The sufficiency of the evidence under section 232, subdivision (a)(6).*

Having determined the governing standard, we turn now to the question of the sufficiency of the evidence under that standard. ■ While the trial

court was required to make its findings on the basis of clear and convincing evidence (*In re Angelia P.* (1981) 28 Cal.3d 908, 919 [171 Cal.Rptr. 637, 623 P.2d 198]), this court must uphold those findings if there is *substantial evidence,* such that a reasonable trier of fact could find that termination of parental rights is appropriate based on clear and convincing evidence. (*Id.,* at p. 924.)

 Two experts, a psychiatrist and a psychologist, testified as to appellant's condition. Both diagnosed her as schizophrenic. The psychologist went on to define schizophrenia, including in his explanation numerous examples of appellant's symptoms which conformed to the definition: "Schizophrenia [*sic*] is a disorder marked by certain psychotic features, a period of time that must last at least six months, and certain symptoms that almost always include delusions, hallucinations and some impairment in what we call the form of thought, which I can explain.

". . . . . . . . . . . . . . . . . . . . . .

"Thought. Where the delusions are the word we use for the content of someone's thought. Even beyond the content of someone's thought there seems to be some impairment in just the manner in which people go about their thinking, and that's what we refer to as the form of thought.

"There are certain types of schizophrenia that highlight the more dramatic aspects of the illness, and she has been diagnosed to my knowledge as paranoid type, undifferentiating type, and schizoaffective.

". . . . . . . . . . . . . . . . . . . . . .

"Certain types of schizophrenia include delusions of various types, and in Linda's case it has typically included somatic delusions, wherein she's believed there has been a tadpole in her veins, I believe. She believes she was passing worms. . . . She has had delusions of persecution wherein she has believed people have been trying to shoot her. She has had other delusions of the drain in the sewer being hooked up to her kitchen sink, which caused her food to taste badly. . . .

". . . . . . . . . . . . . . . . . . . . . .

"She has believed at times that her sister and brother-in-law were ghosts. She has believed at times that her son, Adam, was dead for no apparent reason. And I could add to that. There is a long list of delusional beliefs.

"Schizophrenia is also evidenced by hallucinations. She has been noted to have since '78 auditory hallucinations wherein she would hear voices

when there was actually no one present. She was hallucinating at the initial admission. She was hallucinating during the last admission in August where she told me in the interview that she was hearing her son crying to her when, in fact, her son was not present.

"In terms of the form of her thought, that's typically manifested by something we call looseness of associations where, hopefully, my association is making some sense and people are able to follow what I am saying. But in looseness of associations, someone starts with a thought, and then there is something within that thought that leads them to think something else, which takes them to a tangent, and from that tangent something keys them to go off to another tangent. So to an outside observer it's very difficult to follow the train of thought. It does not seem to be goal directed. The assumption being that it makes sense to the person expressing it.

"Linda has been noted at many times to exhibit looseness of associations to the point of being incoherent in that she's incomprehensible.

"She's also demonstrated in terms of the form of her thinking a lot of thought pressure, which I describe typically as your mouth not working fast enough to express the thoughts that are racing through your mind.

"Another disturbance typically of schizophrenia is affect . . . which is the observable emotional response that people demonstrate, and she has varied at times from very typically having flat affect, which is no observable emotional response, in spite of what she is saying would seem to provoke an emotional response, to other times which she has been hyperirritable, other times in which she has been somewhat euphoric, other times in which she has been very depressed. And we refer to that as lability . . . of affect, rapidly changing moods and affects.

"She has been withdrawn at times and has little to do with other people, which other disorders demonstrate; but schizophrenia demonstrates very often wherein the person with schizophrenia does not associate and link emotional connections with other people.

"There are other characteristics of schizophrenia. Those are the most common, and the documentation, I think, with certainly [sic] demonstrates the existence over and over and over again of those symptoms. So the diagnosis, in my opinion, is unquestionable."

Neither expert gave appellant a favorable prognosis at the hearing. The psychiatrist characterized her condition as cyclical, with alternating periods of remission and deterioration. He indicated that her illness would require

medical supervision for the foreseeable future and that she would "always need a structured living arrangement where other people are providing for her basic needs, knowing her whereabouts, providing for her food, clothing, shelter, supervising her, making sure she takes her medicine." The psychologist characterized appellant's illness as a lifetime condition, typified by remissions and subsequent deteriorations. He stated that appellant has a "proclivity" for acute episodes and cannot sustain remissions. He concluded that appellant is incapable of providing a stable, ongoing custodial home for Amie and that she would not be able to do so for the foreseeable future.

Appellant asserts the state of the evidence fails to meet the level of "clear and convincing." For example, appellant's brief states that "[the psychologist] testified that [appellant] would be able to care for her child if she was supervised." The testimony to which appellant apparently referred occurred during cross-examination:

"Q. If those periods of decompensation could be controlled or prevented or there was intervention to provide supervision during those periods of time, absent those decompensation periods, do you still feel that she would be able to provide care and supervision for her child?

"A. If they could be prevented, yes." Appellant fails to note, however, that the psychologist felt that the "decompensation periods" could not be prevented. Appellant's brief also contains the statement that "[t]he court also relied on evidence that Linda herself thought it was in the child's best interest to be adopted." While such a statement does appear in the court's tentative decision, it is not among the findings contained in the judgment and order. A conclusion that this issue was "critical" to the judge's opinion is thus unsupported.

In sum, the requirements of section 232, subdivision (a)(6) were met. Two qualified experts testified as to their conclusions that appellant's mental disorder rendered her unable to adequately care for and control Amie and gave considerable background testimony in support of those conclusions. Other evidence and testimony further documented appellant's mental disorder and its symptoms.

Since the trial court had sufficient basis to terminate appellant's parental rights under section 232, subdivision (a)(6), its findings under subdivision (a)(7) are moot. Therefore, only a brief discussion follows.

Section 232, subdivision (a)(7), permits the court to terminate parental rights in a minor "[w]ho has been in out-of-home placement under the supervision of the juvenile court, the county welfare department, or other

public or private licensed child-placing agency for a one-year period, if the court finds that return of the child to the child's parent or parents would be detrimental to the child and that the parent or parents have failed during that period, and are likely to fail in the future, to maintain an adequate parental relationship with the child, which includes providing both a home and care and control for the child.

"
. . . . . . . . . . . . . . . . . . . . . . . . .

"The court shall make a determination that reasonable services have been provided or offered to the parents which were designed to aid the parents to overcome the problems which led to the deprivation or continued loss of custody and that despite the availability of these services, return of the child to the parents would be detrimental to the child. The probation officer or social worker currently assigned to the case of the child shall appear at the termination proceedings."

The court made the requisite findings in its judgment and order. Appellant does not specifically challenge any of the subdivision (a)(7) findings. Implicit in appellant's arguments, however, is that the return of Amie to her mother would not be detrimental to the child. Nevertheless, the evidence presented in support of findings under subdivision (a)(6) is more than sufficient to demonstrate the potential detriment to Amie should she be returned to her mother. As the testifying psychiatrist observed, "I don't think she is capable of taking care of herself, much less taking care of a child."

### III.*

. . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Woolpert, J., and Hamlin, J., concurred.

---

*See footnote, *ante,* page 668.