[No. C010299. Third Dist. Sept. 14, 1992.]

In re HEATHER B., a Person Coming Under the Juvenile Court Law.
SHASTA COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff
and Respondent, v.
JAY B., Defendant and Appellant.

**COUNSEL**

John C. Lyman for Defendant and Appellant.

Karen Keating Jahr, County Counsel, and Michael A. Ralston, Assistant County Counsel, for Plaintiff and Respondent.

**OPINION**

**SPARKS, Acting P. J.**—In this case we consider and reject the claim that a father's constitutional rights were violated by the termination of his parental

rights under an improper burden of proof. Jay B., the natural father of the minor child Heather B., appeals from an order of the juvenile court terminating his parental rights and placing his daughter for adoption pursuant to Welfare and Institutions Code section 366.26 (unless otherwise indicated all further section references are to this code). The father contends: (1) section 366.26 violates principles of due process by permitting the termination of parental rights to be based upon less than clear and convincing evidence; (2) section 366.21 creates an impermissible presumption that a return to parental custody would be detrimental to a dependent child; and (3) the evidence is insufficient. We reject these contentions and shall affirm the order of the juvenile court.

I

LEGISLATIVE SCHEME

Before turning to the father's contentions, we first recount the legislative scheme for reform which governs these proceedings. In the Statutes of 1986, chapter 1122, the Legislature directed the Senate Select Committee on Children and Youth to convene a task force for the purpose, among other things, of making recommendations for changes in our child dependency laws. The task force's proposals for changes in juvenile court law were represented in several measures, particularly Senate Bill No. 243 (Presley), which was enacted as chapter 1485 of the Statutes of 1987. That measure substantially revised the substantive and procedural provisions of our juvenile court law with respect to children, such as Heather, who were first adjudged to be dependent children after January 1, 1989. The changes wrought by that measure fall into three broad categories: (1) providing more explicit and restrictive bases for juvenile court intervention; (2) requiring clearly focused protective and/or reunification services; and (3) providing permanency planning at the earliest stage for those children who cannot live safely with their families. (See Sen. Select Com. on Children and Youth Rep. on Child Abuse Reporting Laws, Juvenile Court Dependency Statutes and Child Welfare Services (1987-1988 Reg. Sess.) p. ii [hereafter Sen. Select Com. Rep.].)

The first category of reform measures was necessary because, in the view of the task force, the existing statutory bases for court intervention were too broad and vague. (Sen. Select Com. Rep., *supra*, at pp. 3-4.) The task force noted that there is variation in the background, training and experience of those who administer the child dependency system and that concepts of abuse and neglect involve value judgments about what constitutes effective parenting. (*Ibid.*) With vague jurisdictional provisions these factors result in

inconsistent practices and inappropriate juvenile court intervention in some cases. (*Ibid.*)

The second category of reforms reiterates and emphasizes the goal of preservation of the family as the first priority in child dependency situations. The task force stated that a major legislative priority should be to develop the means to ensure the availability of public and private services to alleviate family crises which threaten the well-being of children, to prevent the breakup of families, and to reunify families when children must be removed for their safety. (Sen. Select Com. Rep., *supra*, p. v.)

With respect to the first and second categories of reform measures the Legislature expressed its intent in the penultimate paragraph of section 300, which provides in part: "It is the intent of the Legislature in enacting this section to provide maximum protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to protect children who are at risk of that harm. This protection includes provision of a full array of social and health services to help the child and family and to prevent reabuse of children. That protection shall focus on the preservation of the family whenever possible. Nothing in this section is intended to disrupt the family unnecessarily or to intrude inappropriately into family life, to prohibit the use of reasonable methods of parental discipline, or to prescribe a particular method of parenting. Further, nothing in this section is intended to limit the offering of voluntary services to those families in need of assistance but who do not come within the descriptions of this section. . . ."

The third category of reforms represents a legislative policy determination that reunification services should be "time-limited" in favor of permanency planning at the earliest appropriate time. (Sen. Select Com. Rep., *supra*, p. ii.) The task force sought to eliminate situations in which adoptable children are required to "wait months and often years for the opportunity to be placed with an appropriate adoptive family." (*Id.* at p. 10.)

The procedures governing children who first entered the juvenile dependency system after January 1, 1989, can be illustrated with particular reference to Heather's circumstances.[1] A county social worker may take a child into temporary custody if the social worker has reasonable cause to believe the child is in immediate need of medical care, is in immediate

---

[1]This appeal is a companion to *In re Barbara B.* ((Sept. 18, 1992) C010123 [nonpub. opn.]) in which the father and mother appeal from juvenile court orders with respect to Heather's siblings, Barbara and Robin. Here we will restrict our factual recitation to those matters affecting Heather and her father.

danger of physical or sexual abuse, or there is an immediate threat to the child's health or safety. (§ 306, subd. (b).) Before taking a child into temporary custody a social worker is required to consider whether there are any reasonable services which will eliminate the need to interfere with parental custody, and to use those services if they are available. (*Ibid.*) When a child is taken into temporary custody the probation officer must investigate the case and must attempt to maintain the child with his or her family through the provision of services unless certain specified conditions exist. (§§ 309, 328.)

In this case Heather was referred to the Department of Social Services of Shasta County (DSS) by police officers after her parents were arrested on drug charges.[2] Police officers noted that Heather and her sisters were present when their mother was arrested in a motel room and that hypodermic needles and razor blades were within easy reach of the children. DSS took the children into custody and juvenile court proceedings were commenced on January 31, 1989. Heather was then two years old.

When a child is taken into custody and a dependency petition is filed, the court must hold a prompt detention hearing. (§ 311.) The court is required to release the child from custody unless a prima facie showing has been made that the child comes within section 300 and it appears that: (1) there is a substantial danger to the physical health of the child or the child is suffering severe emotional damage and the child cannot be protected without removing him or her from parental custody; (2) the parent is likely to flee the jurisdiction of the court; (3) the child has left a previous placement; or (4) the child is unwilling to return home if the child was physically or sexually abused by a person residing in the home. (§ 319.) The court is required to consider whether reasonable efforts were made to prevent or eliminate the need for removal from parental custody and whether services are available which would prevent the need for further detention. (*Ibid.*) If the child is detained the court must order that reunification services be provided as soon as possible if appropriate. (*Ibid.*)

---

[2]The family first came to the attention of DSS in July 1988, upon a referral from Mercy Medical Center in Redding. It was reported that the mother had been scheduled for a Caesarean section birth but failed to appear. The mother appeared to be a heavy drug user and it would be necessary to monitor carefully the condition of her unborn child during birth. DSS convinced the mother to reschedule her Caesarean delivery. When the child, Nathan, was born both mother and child tested positive for methamphetamine. A dependent child proceeding was commenced on behalf of Nathan and he was placed with his grandmother. Reunification plans were formulated for both parents with respect to Nathan, but compliance was minimal. The social worker assigned to Nathan's case expressed concern for the welfare of his siblings, Barbara, Robin and particularly Heather, who has cerebral palsy and is developmentally delayed.

At the time of Heather's detention hearing both of her parents were incarcerated. She was detained and placed in the home of her maternal grandmother.

Juvenile court proceedings are bifurcated, as they were under prior law. Under this procedure the jurisdictional hearing addresses the question whether the child is described by section 300, and the question whether the child should be adjudged a dependent child is not determined until the dispositional hearing. (§§ 355, 360; see *In re La Shonda B.* (1979) 95 Cal.App.3d 593, 599 [157 Cal.Rptr. 280].) At the jurisdictional hearing proof by a preponderance of evidence legally admissible in the trial of civil cases must be adduced to sustain the allegations of the petition. (§ 355.)

The bases for jurisdiction under section 300 are more narrowly defined than under prior law with the legislative expectation that intervention will be avoided except where it is actually necessary. (See Sen. Select Com. Rep., *supra*, pp. 3-4.) In this case the petition alleged that Heather came within section 300, subdivision (b), which provides in relevant part: "The minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the minor, or the willful or negligent failure of the minor's parent or guardian to adequately supervise or protect the minor from the conduct of the custodian with whom the minor has been left, or by the willful or negligent failure of the parent or guardian to provide the minor with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the minor due to the parent's or guardian's mental illness, developmental disability, or substance abuse. . . . The minor shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the minor from risk of suffering serious physical harm or illness." This reflects a legislative determination that to justify intervention the risk of harm must be substantial and the threatened harm must be of a serious nature. (Sen. Select Com. Rep., *supra*, p. 5.)

The factual allegations in support of the petition on Heather's behalf included charges that the mother had tested positive for methamphetamine at the time of the birth of her youngest child, Nathan, for whom a dependency proceeding had previously been commenced; the father had admitted that in the past he had a drug abuse problem; and a few days before the petition was filed both parents had been arrested on drug charges. At the jurisdictional hearing both parents admitted the allegations of the petition.

If the jurisdictional allegations of a petition are sustained then at the dispositional phase the court may order that services be provided to keep the

family together without adjudging the child a dependent child, or may adjudge the child to be a dependent child. (§ 360.) If the child is adjudged to be a dependent child, he or she may not be removed from parental custody unless the court finds clear and convincing evidence of certain prerequisite facts. (§ 361, subd. (b).) The court must also determine whether reasonable efforts were made to prevent or eliminate the need for removal of the child from his or her home or if, in specified situations, it was reasonable under the circumstances not to make such efforts. (§ 361, subd. (c).)

In this case, the court adjudged Heather to be a dependent child and ordered that she be removed from parental custody under section 361, subdivision (b)(1), which provides in relevant part: "There is a substantial danger to the physical health of the minor or would be if the minor was returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents' or guardians' physical custody. . . ." The court ordered that Heather be placed in a licensed foster home.

If a child is removed from parental custody then the court must order reunification services unless it finds clear and convincing evidence of certain factors which would make such services inappropriate. (§ 361.5, subds. (a), (b).) In this case the court did not make such findings and reunification plans were adopted for each parent.

The status of every dependent child in foster care must be reviewed periodically but not less than once every six months. (§ 366.) At the first six-month review hearing, "the court shall order the return of the minor to the physical custody of his or her parents or guardians unless, by a prepon-derance of the evidence, it finds that the return of the child would create a substantial risk of detriment to the physical or emotional well-being of the minor." (§ 366.21, subd. (e).) If the child is not returned home then the court must consider whether reasonable reunification services were provided and must order such services to be initiated or continued unless it finds clear and convincing evidence of certain factors which would render such services inappropriate. (§ 366.21, subd. (e).)

When a report and recommendation for Heather's six-month review hear-ing was prepared in August 1989, it appeared that the mother's whereabouts were unknown and the father had not contacted the social worker since June. Although visitation had been scheduled on a weekly basis, the father had visited only twice, once in April and once in June. Contrary to the require-ments of his reunification plan, the father had not completed a parenting class, had not become involved in the county substance abuse program, had

not maintained regular visitation, and had not kept DSS informed of his whereabouts. At the six-month review hearing Heather was continued as a dependent child in foster home placement, DSS was ordered to continue providing reunification services, and the parents were ordered to comply with amended reunification plans.

At the 12-month review hearing the court must order the return of the minor to parental custody unless it finds, by a preponderance of the evidence, that a return to parental custody would create a substantial risk or detriment to the child's physical or emotional well-being. (§ 366.21, subd. (f).) If the child is not returned home then the court has certain options. If it finds that there is a substantial probability the child will be returned to the physical custody of a parent within six months or if it does not find clear and convincing evidence that reasonable reunification services were provided, then the court must continue the case for up to six months. (§ 366.21, subd. (g)(1).) Otherwise the court must order a hearing pursuant to section 366.26, to be held within 120 days. (§ 366.21, subds. (g)(2), (g)(3).) In that event the court must order that reunification services be terminated but shall permit continued visitation pending the hearing unless it finds visitations would be detrimental to the child. (§ 366.21, subd. (h).)

In January 1990 Heather's social worker prepared a status report and recommendation for the 12-month review which was scheduled for February 1990. The report recommended that reunification services be terminated and that a hearing be scheduled pursuant to section 366.26. The social worker explained: "[The parents] have not availed themselves of any of the services offered. The parents have not visited with the minors since June, 1989. The parents have not had psychological evaluations as they have not maintained a stable address so that they could be referred for a scheduled appointment. They have not participated in counseling. They have not attended parenting classes. They did not follow through with Substance Abuse treatment services . . . . They have not maintained a stable living situation. They have been incarcerated several times. They have not kept in touch with the social worker or notified me of any changes in address. They have not been employed. In brief, there has been no change or progress made by either parent."

Heather's 12-month review was ultimately continued until June 1990, more than 15 months after the original dispositional hearing. At that time the court found that a return of Heather to parental custody would create a substantial risk of detriment to her physical and/or emotional well-being, there was no reasonable probability that she could be returned to parental custody within six months, and that reasonable reunification services were

offered but not utilized by the parents. The court ordered a hearing under section 366.26 to be held, terminated reunification services, and terminated visitation upon finding that continued visitation would be detrimental to Heather.[3]

A hearing under section 366.26 is intended to provide a permanent plan for children who cannot be returned to parental custody. Adoption, if possible, is the preferred plan for such children. (Sen. Select Com. Rep., *supra*, at p. 11.) For children who are adoptable, the Legislature sought to eliminate the duplicative and time-consuming requirement that a county child protective agency obtain authorization from the court and then file a separate proceeding under Civil Code section 232 in order to terminate parental rights. (Sen. Select Com. Rep., *supra*, p. 10.) Section 366.26 now provides the exclusive procedures for the termination of parental rights in the context of a dependent child proceeding. (§ 366.26, subd. (a).)[4] A hearing under section 366.26 is governed exclusively by the standards set forth in that statute. (*Ibid.*) Consequently, Civil Code section 4600 is not applicable. (*Ibid.*)[5]

Section 366.26 not only provides the exclusive procedures for a termination of parental rights over dependent children, it also limits the circumstances under which a termination of parental rights may be accomplished. In a superior court action pursuant to Civil Code section 232, the parent of a dependent child who, despite reunification services, failed to provide a home and care and control of the child for a one-year period could face termination

---

[3]In this case the court ordered a hearing under section 366.26 at the 12-month review. In situations where the court continues the case for an additional period, the 18-month review is similar to the 12-month hearing except that it is, essentially, the end of the road for reunification services. (§ 366.22, subd. (a).) If the child is not returned home after 18 months then the court must develop a permanent plan. (§ 366.22, subd. (b).) This requires a hearing under section 366.26 unless the court finds by clear and convincing evidence that the child is not adoptable and has no one willing to accept legal guardianship, in which case the court may order that the child remain in long-term foster care. (*Ibid.*) In any event reunification services are terminated. (*Ibid.*)

[4]Section 366.26 does not, however, supersede procedures for the termination of parental rights in adoption proceedings under Civil Code sections 221.20, 222.10, and 7017. (§ 366.26, subd. (a).)

[5]Civil Code section 4600, which is part of the Family Law Act, provides, among other things, that in order to make a child custody award to a nonparent, the court must find that an award of custody to a parent would be detrimental to the child and that an award to a nonparent is required to serve the best interests of the child. In *In re B. G.* (1974) 11 Cal.3d 679, at pages 695 and 696 [114 Cal.Rptr. 444, 523 P.2d 244], the Supreme Court concluded that Civil Code section 4600 applies to juvenile court proceedings. The Legislature has now specified that Civil Code section 4600 is not to be applied in hearings under section 366.26.

of his or her parental rights. (Civ. Code, § 232, subd. (a)(7).)[6] There was no requirement of a showing that the child would be likely to be adopted. (*In re Laura F.* (1983) 33 Cal.3d 826, 838 [191 Cal.Rptr. 464, 662 P.2d 922].) Thus, under prior law, a dependent child could face what has been termed "the limbo of perpetual foster care" without any parental relationship, effective or not. (*Ibid.*; see also *Santosky* v. *Kramer* (1982) 455 U.S. 745, 765, fn. 15 [71 L.Ed.2d 599, 614, 102 S.Ct. 1388].) Under section 366.26, subdivision (c), proof by clear and convincing evidence that a dependent child is likely to be adopted is the sine qua non of an order terminating parental rights. Absent such a showing the court may make arrangements for the child's long-term care which may or may not include active parental involvement, but the parental relationship may not be terminated. (§ 366.26, subds. (c), (d).)

Under section 366.26, the likelihood of adoption is the pivotal question. Subdivision (c) of that section provides that the court shall terminate parental rights if it finds clear and convincing evidence that it is likely the child will be adopted, unless it finds circumstances that would render termination detrimental to the child.[7] If the court finds a likelihood of adoption and does not find circumstances that would make termination detrimental, then "the findings pursuant to subdivision (b) of Section 361.5 that reunification services shall not be offered, or the findings pursuant to subdivision (e) of Section 366.21 that the whereabouts of a parent have been unknown for six months or that the parent has failed to visit or has failed to visit or contact the child for six months or that the parent has been convicted of a felony indicating parental unfitness, or pursuant to Section 366.21 or Section 366.22 that a minor cannot or should not be returned to his or her parent or guardian, shall then constitute a sufficient basis for termination of parental rights . . . ." (§ 366.26, subd. (c)(1).)[8]

---

[6]There are other bases for a termination of parental rights under Civil Code section 232, which have also been superseded by section 366.26. Subdivision (a)(7) of Civil Code section 232 is the provision that would have been applicable to Heather and her father under prior law.

[7]The circumstances which would make termination detrimental are: the parents have maintained regular visitation and contact and the child would benefit from continuing the relationship; a child who is 10 years of age or more objects to the termination of parental rights; the child is in a residential treatment facility, adoption is unlikely or undesirable, and continuation of the parental relationship will not prevent finding a permanent placement if the parents cannot resume custody when residential care is no longer needed; or the child is living with a relative or foster parent who is unable or unwilling to adopt the child for exceptional reasons unrelated to unwillingness to accept responsibility for the child, but is willing to provide a stable and permanent environment and removal of the child would be detrimental. (§ 366.26, subd. (c)(1).)

[8]In 1991, the Legislature added subdivision (c)(2) to section 366.26, to state: "The court shall not terminate parental rights if at each and every hearing at which the court was required

Heather has cerebral palsy, is developmentally delayed, and has aggressive tendencies. At her hearing under section 366.26, DSS witnesses conceded that her potential for adoption would be complicated due to these factors. Nevertheless, they believed Heather to be adoptable and were confident about finding an adoptive placement for her. DSS and Heather's counsel argued for a termination of parental rights in favor of adoption.

In its findings the court identified adoption as the appropriate goal for Heather and concluded that she had a probability of being adopted. However, the court found the evidence of Heather's likelihood of adoption to be less than clear and convincing. It declined to order immediate termination of parental rights and instead selected an alternate procedure under section 366.26, subdivision (c)(3). That procedure gave DSS 60 days to identify an appropriate adoptive family for Heather, after which another hearing would be held. (§ 366.26, subd. (c)(3).)

At the subsequent hearing the adoption social worker testified that DSS had received seven home studies and several telephone inquiries from families interested in adopting Heather. DSS had identified one particular family for consideration and Heather had visited that family on six occasions. The family had experience with a child with Heather's disabilities and had the opportunity to observe Heather personally. They were desirous of proceeding with an adoption of Heather and were "most anxious" to have the process move forward. The court found by clear and convincing evidence that Heather would be adopted. It ordered a termination of parental rights so that adoption could proceed.

## II

### STANDARD OF PROOF

In juvenile court proceedings for dependent children, the Legislature has specified that clear and convincing evidence is the standard of proof to be applied to most of the findings which must be made. These include the initial decision to remove a child from parental custody (§ 361, subd. (b)); the determination that reunification services not be offered (§ 361.5, subd. (b)); the determination that the whereabouts of the parent of a child removed initially under subdivision (g) of section 300 are still unknown or the parent has been convicted of a felony indicating parental unfitness (§ 366.21, subd. (e)); the determination at the 12-month review hearing whether reasonable reunification services were offered (§ 366.21, subd. (g)); and the determination at the hearing under section 366.26 whether the child is likely to be adopted (§ 366.26, subd. (c)).

to consider reasonable efforts or services, the court has found that reasonable efforts were not made or that reasonable services were not offered or provided." (Stats. 1991, ch. 820, § 5.)

Only on one question has the Legislature specified a preponderance of the evidence standard. At a review hearing a dependent child who has been removed from parental custody must be returned home unless to do so would create a substantial risk of harm to the child. The burden of proof is upon the county agency, but the issue is to be determined by the preponderance of the evidence. (§§ 366.21, subds. (e), (f); 366.22, subd. (a).)

Although a hearing under section 366.26 does not incorporate a preponderance of the evidence standard, section 366.26 does provide that the findings at the hearing which resulted in an order for a hearing under section 366.26 shall constitute a sufficient basis for termination of parental rights if there is clear and convincing evidence that the child is likely to be adopted. When the decision to order a hearing under section 366.26 is made at the initial dispositional hearing or at the six-month review hearing, on the basis that reunification services are not warranted, the findings which support the decision must be made by clear and convincing evidence. (§§ 361.5, subd. (b); 366.21, subd. (e).) Where, as here, the section 366.26 hearing is ordered at the 12-month review hearing the determination that reasonable reunification services were offered must be made by clear and convincing evidence, but the finding that the child cannot or should not be returned home due to substantial danger is made under a preponderance of the evidence standard. (§ 366.21, subd. (f).)

Heather's father asserts that since the determination at the review hearing can lead to a termination of parental rights under section 366.26 without further inquiry into parental fitness, the use of a preponderance of the evidence standard at the review hearing is constitutionally prohibited.[9]

 In view of the circumstances of Heather's case, there are three aspects to her father's constitutional argument: (1) Is it constitutional for the Legislature to specify a preponderance of the evidence standard for the determination whether a return to parental custody would create a substantial risk to the child? (2) Is it within the Legislature's prerogative to order the termination of parental rights with respect to an adoptable dependent child based upon the fact that the child was not returned to parental

[9]This issue is now pending before the Supreme Court in *Cynthia D. v. Superior Court* (1992) 3 Cal.App.4th 913 [4 Cal.Rptr.2d 909], review granted April 23, 1992 (S025807), and *In re Daniela M.* (1992) 3 Cal.App.4th 226 [4 Cal.Rptr.2d 290], review granted April 23, 1992 (S025571).

After the filing of his brief, counsel for the father requested that we consider the recently filed opinion in *In re Reylene A.* █(Cal.App.), a case not yet final. There, the court held that section 366.26 violates the federal due process guaranty by allowing for the permanent severance of a parent-child relationship by reference to an order made on a preponderance of the evidence standard. For the reasons stated in the body of our opinion, we respectfully disagree and therefore decline to follow *In re Reylene A.*

custody at the 12-month or, at the latest, the 18-month review hearing? If the answers to the first two questions are affirmative, do the substantive and procedural aspects of our juvenile court law operate together to deny due process of law to a parent?

 Since the father's contention is inferentially grounded on both the federal and state Constitutions, we begin our analysis with the leading federal case. In *Santosky* v. *Kramer, supra,* 455 U.S. 745 [71 L.Ed.2d 599], the United States Supreme Court considered New York's procedures for the termination of parental rights upon a determination that a child was "permanently neglected." Under New York law a child could be removed from parental custody upon a finding of neglect and the parental relationship could be severed upon a finding of permanent neglect. Permanent neglect would be shown by evidence that the child had been in state custody for a year or more, the state had made diligent efforts to encourage and strengthen the parental relationship, but the parents failed substantially and continuously or repeatedly to maintain contact with the child or to plan for his or her future although physically and financially able to do so. (*Id.* at p. 748 [71 L.Ed.2d at p. 603].) These findings were to be proven by " 'a fair preponderance of the evidence.' " (*Ibid.*)

In *Santosky,* by a five-to-four decision, the high court found that the New York procedure did not comport with due process requirements. The court noted that the function of a standard of proof is to instruct the factfinder concerning the degree of confidence he or she should have in the correctness of factual conclusions for a particular type of adjudication. (455 U.S. at pp. 754-755 [71 L.Ed.2d at pp. 607-608].) This reflects the weight of the private and public interests affected as well as a societal judgment about how the risk of error should be distributed between the parties. (*Ibid.*) In a civil dispute over monetary damages the preponderance of the evidence standard reflects society's minimal concern with the outcome and a conclusion that the parties should bear the risk of error in roughly equal fashion. (*Ibid.*) Parental rights, on the other hand, are a fundamental liberty interest and the standard of proof required in an action to terminate such rights requires a balancing of the private interests affected, the risk of error created by the state's chosen procedure, and the countervailing governmental interest supporting the procedure. (*Id.* at pp. 753-754 [71 L.Ed.2d at pp. 606-607].)

On the first factor, the private interests affected, the court noted that parental rights are fundamental and that the state sought not merely to infringe, but to end those interests. (*Santosky* v. *Kramer, supra,* 455 U.S. at pp. 758-759 [71 L.Ed.2d at p. 610].) The child and his or her foster parents are "deeply interested" in the outcome, "[b]ut at the factfinding stage of the

New York proceeding, the focus emphatically is not on them. [¶] The factfinding does not purport—and is not intended—to balance the child's interest in a normal family home against the parents' interest in raising the child. Nor does it purport to determine whether the natural parents or the foster parents would provide the better home. Rather, the factfinding hearing pits the State directly against the parents." (*Id.* at p. 759 [71 L.Ed.2d at p. 610].) Until the state has established parental unfitness it cannot assume that the interests of the child and his or her parents diverge and until such time parent and child share an interest in preventing an erroneous termination of the relationship. (*Id.* at p. 760 [71 L.Ed.2d at p. 611].) The *Santosky* court concluded that the balance of private interests strongly favored heightened procedural protections. (*Ibid.*)

Concerning the second factor, the risk of error in the chosen procedure, the court held that a New York permanent neglect proceeding is an adversary contest between the state and a child's natural parents, and that in such circumstances the relevant question is whether a preponderance of the evidence standard fairly allocates the risk of an erroneous factfinding between these two parties. (*Santosky* v. *Kramer, supra*, 455 U.S. at p. 761 [71 L.Ed. 2d at p. 612].) The court found that several aspects of the New York procedure combined to magnify the risk of an erroneous determination, including imprecise substantive standards which left determinations unusually open to subjective standards; the fact that the court possessed unusual discretion to underweigh probative evidence favoring the parent; the state's greater ability to assemble its case; the fact that the state had the power to shape the historical events that formed the basis for termination; and the lack of any "double jeopardy" defense against repeated state termination efforts. (*Id.* at pp. 762-764 [71 L.Ed.2d at pp. 612-613].) The court concluded that increasing the burden of proof is one way to impress the factfinder with the importance of the decision and thereby reduce the chances of an erroneous determination. (*Ibid.*)

With respect to this second factor the high court addressed the conclusion of the New York courts that the preponderance standard properly allocated the risk of error between the parents and the child. The court found this view to be fundamentally mistaken. (*Santosky* v. *Kramer, supra*, 455 U.S. at p. 765 [71 L.Ed.2d at p. 614].) That theory assumed that termination would invariably benefit the child, which the court found to be a hazardous assumption at best in view of the lack of assurance that termination would result in adoption and evidence that after termination many New York children entered the limbo of long-term foster placement. (*Id.* at p. 765, especially fn. 15 [71 L.Ed.2d at p. 614.) In any event, under New York's procedure the consequence of an erroneous determination for the child was the preserva-

tion of an "uneasy status quo" and this risk did not weigh heavily against the parents' risk of erroneous termination of parental rights. (*Id.* at pp. 765-766 [71 L.Ed.2d at pp. 614-615].)

On the third factor, the governmental interest supporting the procedure, the court identified the state's interests as the *parens patriae* interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings. (*Santosky* v. *Kramer, supra,* 455 U.S. at pp. 766-767 [71 L.Ed.2d at p. 615].) Where there is still reason to believe that a positive, nurturing parent-child relationship exists, the *parens patriae* interest favors preservation rather than termination of parental bonds. Moreover, the court concluded, an elevated standard of proof would not unduly burden New York's fact finders. (*Ibid.*)

Our current child dependency procedures are significantly different from the New York scheme which was at issue in *Santosky.* In most aspects our Legislature has specified a clear and convincing evidence standard of proof for the various findings to be made but has reserved a preponderance of the evidence standard of proof with respect to one question, namely whether a child who has been removed from parental custody may be returned home safely. As to this question the Legislature has sought to avoid reliance upon subjective standards and unusual judicial discretion by narrowing the question to one of substantial risk of serious physical or emotional harm. (§ 366.21, subd. (e); Sen. Select Com. Rep., *supra,* p. 5.) This question is not a matter of weighing the "best interests" of the child against parental rights but is focused upon the child's interest in personal safety. The consequence to the child of an erroneous determination is not merely the preservation of an uneasy status quo, but is a substantial risk of personal harm.[10] To the extent the state has the power to shape the historical events that form the basis for the decision, and to the extent the child's interest in a secure and permanent home are at issue in these proceedings, the Legislature has imposed a clear and convincing evidence standard of proof. (§§ 366.21, subd. (g)(1), 366.26, subd. (c)(1).)[11]

---

[10]Under the New York scheme at issue in *Santosky,* upon denial of a petition to terminate parental rights the judge had ample discretion to continue the child in out-of-home placement. (455 U.S. at p. 766, fn. 16 [71 L.Ed.2d at p. 614].) The Legislature has crafted our current statutory scheme to circumscribe a juvenile court judge's discretion, and unless at the review hearing the county agency establishes that it would be dangerous to return a child home, the child must be returned to parental custody.

[11]In this case the court ordered a hearing under section 366.26 to be held after the 12-month review hearing. At the 12-month review hearing the court cannot order a hearing under section 366.26 to be held unless there is clear and convincing evidence that reasonable reunification services were provided or offered to the parents. (§ 366.21, subd. (g)(1).) If, at the 12-month review, a juvenile court continues the case for an additional 6 months then at the 18-month hearing the court must consider whether reasonable services were offered or

It must be remembered that at the time of a review hearing it has already been shown by clear and convincing evidence that the child must be removed from his or her parent's physical custody. (§ 361, subd. (b).) In these circumstances the observations of the court in *In re Audrey D.* (1979) 100 Cal.App.3d 34, at pages 44 and 45 [160 Cal.Rptr. 802], are relevant: "First, after the child has been taken from parental custody pursuant to a clear showing that such custody was injurious to the child, both the knowledge of the parties and the availability of evidence favor placing the burden on the parent to show change of circumstance or new evidence. For example, even if the parent continues to suffer from the same mental disorders that necessitated the child's being taken away, it may be very difficult for the social worker to make a 'clear showing' of that fact at an annual review hearing. With the child out of the home, the social worker faces severe practical difficulties in compiling new facts bearing upon the progress of the parent. The most important source of evidence—the parent's actual treatment of the child—is no longer available. The parent, on the other hand, has first-hand knowledge of everything that has happened to him or her that bears upon the custody issue. [¶] Secondly, we believe that in the absence of proof to the contrary, there is an unacceptably high *probability* that the previously existent injurious circumstances may continue to exist. For example, where a parent's emotional disorder is the cause of neglect of a child to the point that the child incurs serious illness or injury, common experience does not tell us that such a disorder will cease to exist after the mere passage of time. To allocate to the state or county the burden of [re-proving] detriment at every annual review hearing is to impose a presumption that those circumstances that led to the removal of the child from parental custody no longer exist. Yet, a presumption that such a significant change has occurred is based upon neither logic nor reason. [¶] Finally, placing the burden on the parent to show change of circumstances also yields the most desirable result in terms of public policy in the absence of proof of the particular fact. Once a parent's custody has been found to be injurious to a child because of extreme neglect or abuse, there then exists a proven risk of

---

provided, but must develop a permanent plan in any event; there is no statutory provision which would permit a case to be further continued. (§ 366.22, subd. (a).) At the hearing under section 366.26, parental rights may be terminated unless at each and every review hearing the court found that reasonable services were not offered or provided. (§ 366.26, subd. (c)(2).) Since the Legislature has not specified a standard of proof for that determination at the six- or eighteen-month review hearings (§§ 366.21. subd. (e), 366.22, subd. (a)), the standard would presumably be a preponderance of the evidence. (See Evid. Code, § 115.) In that event it would be possible for parental rights to be terminated at a section 366.26 hearing after an 18-month review hearing without a finding having been made by clear and convincing evidence that reasonable reunification services were offered or provided. Since we are here concerned with the termination of parental rights after the 12-month review hearing which requires a clear and convincing evidence standard of proof as to reunification services, we do not address the unusual situation which might occur after the 18-month review hearing.

injury to the child. Such injury is potentially permanent and irreversible. It may even result in the death of the child. Or, it may involve emotional scars or permanent physical impairment, both of which create costs that society may have to bear throughout the child's life." (Italics in original.)

Under our current statutory scheme a parent does not bear a burden of proof on the issue of return of a child to parental custody. In fact, it is presumed that the child should be returned to parental custody and the child must be returned to parental custody unless the county agency establishes that a return to parental custody would create a substantial risk or detriment to the physical or emotional well-being of the child. (§ 366.21, subd. (f).) In determining that a preponderance of the evidence standard should apply to that question, the Legislature doubtlessly had the *In re Audrey D.* factors in mind. In the final analysis, however, the standard of proof must reflect the interests affected and a societal judgment about how the risk of error should be distributed between the parties. (*Santosky* v. *Kramer, supra,* 455 U.S. at pp. 754-755 [71 L.Ed.2d at p. 607].) In most situations clear and convincing evidence is statutorily required under our procedures. But where a child's home has been proven by clear and convincing evidence to be an unfit place to live, then on the question whether a return to parental custody would create a substantial risk to the child's personal safety our Legislature has determined that the child should not bear a disproportionate share of the risk of an erroneous determination. We do not believe that the United States Supreme Court would conclude that the child's interest in personal safety and the state's interest in protecting the child from serious harm are so insignificant that the selection of a preponderance of the evidence standard on this narrow question is beyond the legislative prerogative.

The decision in *In re Angelia P.* (1981) 28 Cal.3d 908 [171 Cal.Rptr. 637, 623 P.2d 198], on which the father principally relies, is not to the contrary. In that case the court considered the contention that proof beyond a reasonable doubt rather than the legislatively prescribed clear and convincing evidence standard should be required for termination of parental rights under Civil Code section 232 proceedings. The court found that the clear and convincing evidence standard appropriately balanced the interests involved, which it found to be "those of (1) the parent and child in a continuing familial relationship; (2) the parent in preserving the integrity and privacy of the family unit, free of state intervention and social stigma attached to either parent or child; (3) the child in a permanent, secure, stable, and loving environment; and (4) the state in protecting the child." (28 Cal.3d at p. 919.)

As we have noted, in our current statutory scheme the Legislature has attempted to balance these interrelated and sometimes conflicting interests

by imposing a clear and convincing evidence standard for most of the determinations which must be made. It is only on the narrow question whether a child would be subjected to a substantial risk of harm in a return to a home which has already been found to be unfit that the Legislature has chosen a preponderance of the evidence standard. The adequacy of a preponderance standard on that narrow question in light of the child's interest in personal safety was not at issue in *In re Angelia P.* However, in its discussion the court did recognize the importance of the child's interests: " 'Not only is the child a helpless party but the parents should suffer the consequences of their inadequacy rather than the child.' " (28 Cal.3d at p. 917, quoting Wald, *State Intervention on Behalf of 'Neglected' Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights* (1976) 28 Stan.L.Rev. 625, 638, fn. omitted.)

Moreover, in *In re Angelia P.*, the court recognized that this is an appropriate area for legislative policymaking: "The several statutory changes in the standard represent a clear legislative assertion of a right to establish such a test. There is authority for the Legislature's exercise thereof because 'Here we are in the arena of policy, but not properly judicial policy . . . . [T]hese are social problems which the Legislature has attempted to deal with over the years as it deems best, attempting to balance the interest of the children with that of the parents.' " (28 Cal.3d at p. 922, quoting *In re Terry D.* (1978) 83 Cal.App.3d 890, 897 [148 Cal.Rptr. 221].) Obviously the Legislature is not free to impose whatever standard of proof it chooses without regard to minimum due process requirements. ■ Nevertheless, the question is addressed to the Legislature in the first instance and courts must defer to legislative policy unless it is in clear violation of the Constitution. (*Eye Dog Foundation* v. *State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 544-545 [63 Cal.Rptr. 21, 432 P.2d 717]; *Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 460-461 [202 P.2d 38, 7 A.L.R.2d 990].) We do not perceive a clear constitutional violation in this instance and we do not believe that the decision in *In re Angelia P.* dictates a contrary result.

■ This brings us to the second aspect of the father's appellate contention, which is substantive in nature. The decisions in *Santosky* and *In re Angelia P.* were concerned with the standard of proof to be applied in a proceeding to terminate parental rights and did not address the substantive question of the minimum factual showing which is constitutionally required. However, in *Santosky* v. *Kramer, supra,* 455 U.S. at page 760, in footnote 10, [71 L.Ed.2d at p. 611], the federal high court did recognize that there are substantive due process limitations upon the power of a state to terminate a parental relationship, citing the decision in *Quilloin* v. *Walcott* (1978) 434

U.S. 246, 255 [54 L.Ed.2d 511, 520, 98 S.Ct. 549], in which the court said: "We have little doubt that the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'" (Quoting *Smith* v. *Organization of Foster Families* (1977) 431 U.S. 816, 862-863 [53 L.Ed.2d 14, 46-47] (conc. opn. of Stewart, J.). See also *Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558, 92 S.Ct. 1208] [holding that an unmarried father who had "sired and raised" his children was entitled to a hearing and some showing of parental unfitness before the children could be taken from his custody].)

■ While it is now settled that a state cannot terminate a parental relationship based solely upon the "best interests" of the child without some showing of parental unfitness,[12] the federal high court has not specifically defined what "some showing" of parental unfitness entails. The terms which the states have utilized to describe parental unfitness are linguistically variable and include parents who have failed, refused or neglected to provide proper or necessary care; children who are neglected, deprived, or abused; children who are in need of supervision; or parents who have failed to maintain contact with the child or to plan for his or her future. (See 43 C.J.S., Infants, § 39, pp. 155-156.) A proceeding to terminate parental rights is not intended to punish a parent but parental conduct is a factor; likewise, the best interest of the child is not determinative but is an important consideration. (*Id.* at § 40, pp. 157-160.)

■ Under our current statutory scheme the Legislature has attempted to narrow the circumstances which may result in the removal of a child from parental custody in order to avoid interference with parental custody except

---

[12]The requirement of a showing of unfitness is dependent upon the existence of an actual, as opposed to merely biological, familial relationship. In *Quilloin* v. *Walcott, supra*, 434 U.S. 246 [54 L.Ed.2d 511], the mother and father had never married or established a home together and a few years after the child's birth the mother married another person. When the child was 11 years old the mother consented to adoption by her husband and the natural father sought to block the adoption and secure visitation rights. The Georgia courts permitted adoption by the mother's husband, which essentially terminated the natural father's parental rights, without an inquiry into the natural father's fitness as a parent. Under the circumstances the United States Supreme Court made short shrift of the father's due process argument: "But this is not a case in which the unwed father at any time had, or sought, actual or legal custody of his child. Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child had never before lived. . . . Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, was in the 'best interests of the child.'" (*Id.* at p. 255 [54 L.Ed.2d at p. 520]. See also *Lehr* v. *Robertson* (1983) 463 U.S. 248, 266-267 [77 L.Ed.2d 614, 629-630, 103 S.Ct. 2985]; *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849 [4 Cal.Rptr.2d 615, 823 P.2d 1216].)

where it is actually necessary and to eliminate the subjective value judgments of social workers and individual judges as a factor. (§§ 202, subd. (a), 300, 361, subd. (b); Sen. Select Com. Rep., *supra*, pp. 4-5.) The Legislature has reemphasized that the primary purpose and initial goal of dependency proceedings is to preserve and/or reunify the family. (§§ 202, subd. (a), 300; Sen. Select Com. Rep., *supra*, p. v.) The new statutory scheme also represents a legislative determination that the state has no interest in terminating a parental relationship of a dependent child, regardless how inadequate or abusive the parent, except where to do so will enable the child to obtain a permanent and secure family relationship through adoption. (§ 366.26, subd. (c).) Thus, when reunification is not possible, our new statutory scheme for the termination of parental rights places pivotal importance on the child's prospect of obtaining a permanent and secure home through adoption.[13]

Under this statutory scheme the Legislature has determined that when (1) a child's home has been shown by clear and convincing evidence to be an unfit place for the child to live, and (2) the county agency has shown by clear and convincing evidence that since that determination reasonable reunification services were provided, but (3) as a result of the determination at the 12-month review hearing, or the 18-month review hearing if the matter is continued, the child will not be returned to parental custody and reunification services will be terminated, then the child's interest in a permanent and secure home warrants termination of parental rights if there is clear and convincing evidence that the child is likely to be adopted, unless factors exist which would make that option detrimental to the child. The wisdom of this legislative determination is not at issue in assessing its constitutionality; rather, we must uphold the Legislature's decision unless it is arbitrary and unreasonable. (*Hale* v. *Morgan* (1978) 22 Cal.3d 388, 398-399 [149 Cal.Rptr. 375, 584 P.2d 512].)

We do not find this scheme to be so arbitrary and unreasonable as to be beyond the Legislature's prerogative. To be sure, this scheme places a burden of action upon the parents of a dependent child, since the parents must work to remove obstacles to the child's return to parental custody within the 12 to 18 months allowed. But decisions of the United States and California Supreme Courts indicate that the state can properly expect and require prompt and reasonable parental efforts. In *Quilloin* v. *Walcott, supra,* 434 U.S. at page 255 [54 L.Ed.2d at page 520], a natural father's inaction,

---

[13]The decision to make likelihood of adoption a pivotal determination before termination of parental rights is in contrast to prior California law, under which parental rights could be terminated in the hope of adoption regardless of how unlikely that prospect might be. (*In re Laura F., supra,* 33 Cal.3d at p. 838.) It is also in contrast to the New York scheme at issue in *Santosky* v. *Kramer, supra,* 455 U.S. at p. 765, fn. 15 [71 L.Ed.2d at p. 614].

coupled with the desire of the child's stepfather to adopt him, permitted the state to refuse to recognize the natural father's parental rights without a showing of unfitness. (See also *Lehr* v. *Robertson, supra,* 463 U.S. at p. 265 [77 L.Ed.2d at p. 629].) Similarly, in *Adoption of Kelsey S., supra,* 1 Cal.4th at page 849, it was held that an unwed father's parental interest is entitled to constitutional protection if he "promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise . . . ." Those cases are not directly controlling since they were concerned with the showing required to establish rather than terminate a protected parental interest. We think, however, that when a parent has been shown to be unfit by clear and convincing evidence the state can expect the parent to engage in prompt and reasonable efforts to cure the problem and can attach significance to a failure to do so.

The United States and California Supreme Courts have also indicated that a child's prospect of obtaining a secure and permanent home through adoption may be a significant consideration. A major flaw in the New York scheme considered in *Santosky* was the lack of assurance that a child freed from parental control would be adopted. (455 U.S. at p. 765, fn. 15 [71 L.Ed.2d at p. 614].) And in *Quilloin* v. *Walcott, supra,* 434 U.S. at page 255 [54 L.Ed.2d at page 520], and *Lehr* v. *Robertson, supra,* 463 U.S. at page 265 [77 L.Ed.2d at page 629], the pending adoption of the children involved was an important consideration.[14] In *In re Laura F., supra,* 33 Cal.3d at page 838, the California Supreme Court held that under our old procedures the mere possibility of adoption was a factor of significance in terminating parental rights.

We cannot conclude that the Legislature acted unreasonably and arbitrarily in determining that reunification services should be time-limited in favor of adoption for those children who cannot be returned to parental custody in a reasonable time but can obtain a secure and permanent home through adoption. Our law has long recognized the importance of a stable and secure home in the lives of children. (See Civ. Code, § 232.6; Stats. 1970, ch. 583, § 1, p. 1160 [uncodified expression of legislative intent]; *In re Laura F., supra,* 33 Cal.3d at p. 837; *In re David B.* (1979) 91 Cal.App.3d 184, 195 [154 Cal.Rptr. 63].) Childhood is fleeting and "[i]t is axiomatic, of course, that the longer children remain in foster homes, the more difficult it is to find families willing to adopt them. (See Mnookin, *Foster Care—In*

---

[14]In *Quilloin* and *Lehr* the proposed adoptions were into families with whom the children had been living rather than by persons who were until then strangers to the child. Under these circumstances the pending adoptions took on even more significance. Yet the court in *Lehr* indicated that adoption, even by strangers, is significant. (*Lehr* v. *Robertson, supra,* 463 U.S. at p. 262, fn. 19 [77 L.Ed.2d at p. 627].)

*Whose Best Interest?* (1973) 43 Harv.Ed.Rev. 599.)" (*In re Laura F., supra,* 33 Cal.3d at p. 837, fn. 10; see also *In re Elise K.* (1982) 33 Cal.3d 138, 148, especially fn. 20 [187 Cal.Rptr. 483, 654 P.2d 253] (conc. opn. of Bird, C. J.).) Our statutory scheme makes family reunification the first priority but if that fails then the child's interest in a permanent and secure home free of the limbo of long-term foster care is elevated to primary significance. This gives recognition to the interests of the parents, child and the state in preserving the family relationship if possible while protecting the child's interest in a stable and secure home against loss through extraordinary delay.

■ This brings us to the final aspect of the constitutional argument, whether the procedural and substantive aspects of our of juvenile court law operate together to deny due process of law in the termination of parental rights. We conclude that they do not. In *Santosky* v. *Kramer, supra,* 455 U.S. at page 760 [71 L.Ed.2d at page 611], the court said: "At the factfinding, the State cannot presume that a child and his parents are adversaries. After the State has established parental unfitness at that initial proceeding, the court may assume at the *dispositional* stage that the interests of the child and the natural parents do diverge." (Italics in original.)

Under our law the decision to terminate parental rights is part of the dispositional stage of juvenile court proceedings. As we have noted, the decision made at the initial dispositional hearing to remove the child from parental custody must be made by clear and convincing evidence. Thus, before the proceedings can reach a section 366.26 hearing, parental unfitness necessarily would have been established by clear and convincing evidence. (§ 361, subd. (b); *In re Katrina C.* (1988) 201 Cal.App.3d 540, 549 [247 Cal.Rptr. 784].) The Legislature is entitled to certain leeway in protecting the child's interests after such a showing has been made. We conclude that the statutory requirements of proof by clear and convincing evidence of (1) the initial finding that a minor must be removed from parental custody, (2) that reasonable reunification services were provided or were unwarranted, and (3) that the child is likely to be adopted, together with the fact that the child will not be returned home as a result of the final review hearing fulfill the requirements of *Santosky.* Accordingly, we reject the father's contention that he was denied due process of law by our statutory procedures.

## III

### PRESUMPTION OF PARENTAL UNFITNESS

On the question of the return of a child to parental custody at a 12-month review hearing, section 366.21, subdivision (f), provides: "The failure of the

parent or guardian to participate regularly in any court-ordered treatment programs shall constitute prima facie evidence that return would be detrimental." Heather's father contends that this statutory provision constitutes an unconstitutional presumption of parental unfitness.

A presumption may be conclusive or rebuttable. (Evid. Code, § 601.) A conclusive presumption requires the factfinder to find an ultimate fact upon proof of the existence of certain predicate facts regardless whether there is other evidence to disprove the ultimate fact. (*Michael H.* v. *Gerald D.* (1987) 191 Cal.App.3d 995, 1005 [236 Cal.Rptr. 810], affd. *Michael H.* v. *Gerald D.* (1989) 491 U.S. 110 [105 L.Ed.2d 91, 109 S.Ct. 2333].) What is called a conclusive presumption might actually be a statement of substantive law, in which case its validity must be judged under standards applicable to substantive laws. (See *Burg* v. *Municipal Court* (1983) 35 Cal.3d 257, 265 [198 Cal.Rptr. 145, 673 P.2d 732]; *People* v. *Dillon* (1983) 34 Cal.3d 441, 474-476 [194 Cal.Rptr. 390, 668 P.2d 697].) In other circumstances a conclusive presumption may be upheld if the ultimate fact necessarily follows from the existence of the predicate facts. (See *Carella* v. *California* (1989) 491 U.S. 263, 266 [105 L.Ed.2d 218, 222, 109 S.Ct. 2419].) In criminal cases, conclusive presumptions have been held to be otherwise impermissible. (*Ibid.*) Where other types of fundamental liberty interests are at stake, the validity of conclusive presumptions is at least questionable. (See *Michael H.* v. *Gerald D.*, *supra*, 491 U.S. 110 [105 L.Ed.2d 91].)[15] However that may be, section 366.21, subdivision (f), does not establish a conclusive presumption. "A statute providing that a fact or group of facts is prima facie evidence of another fact establishes a rebuttable presumption." (Evid. Code, § 602.)

A rebuttable presumption may affect the burden of proof or may affect the burden of producing evidence. (Evid. Code, § 601.) A presumption affecting the burden of proof shifts the burden of persuasion on an ultimate fact to the party against whom the presumption operates upon a finding of the predicate facts. (Evid. Code, § 606.) In a criminal case the state may not employ a presumption to shift to the defendant the burden of proof with respect to an element of the offense. (*Francis* v. *Franklin* (1985) 471 U.S. 307, 316-317 [85 L.Ed.2d 344, 355, 105 S.Ct. 1965].) The considerations and analysis of the validity of a presumption affecting the burden of

---

[15]*Michael H.* v. *Gerald D.*, *supra*, involved a constitutional attack on section 621 of this state's Evidence Code, which creates a conclusive presumption that the issue of a wife cohabiting with her husband who is not impotent or sterile is a child of the marriage. (See *Michael H.* v. *Gerald D.*, *supra*, 191 Cal.App.3d 995.) Although the United States Supreme Court upheld a judgment under that section, no particular view commanded the support of a majority of the justices. The various opinions indicate that in this area conclusive presumptions may not be invalid per se, but at least will be subjected to rigid scrutiny.

proof in a juvenile court proceeding would differ from those involved in a criminal case, but we need not address that question because section 366.21, subdivision (f), does not establish a presumption affecting the burden of proof. A presumption affecting the burden of proof is established to implement some public policy other than to facilitate the particular action in which it applies. (Evid. Code, § 605; *Hansford* v. *Lassar* (1975) 53 Cal.App.3d 364, 371-372 [125 Cal.Rptr. 804].) As we have noted, California's policy is to return children to parental custody if possible. A presumption of parental unfitness would not implement this policy and we discern no other public policy which would be served by a presumption affecting the burden of proof with respect to parental unfitness. The Legislature declared that with respect to a return to parental custody the local agency shall have the burden of proof and we do not perceive that the Legislature intended to shift the burden to the parents by means of a presumption.

A presumption affecting the burden of producing evidence requires the ultimate fact to be found from proof of the predicate facts in the absence of other evidence. If contrary evidence is introduced then the presumption has no further effect and the matter must be determined on the evidence presented. (Evid. Code, § 604.) In section 366.21, subdivision (f), the Legislature has determined that the failure of a parent or guardian to participate regularly in any court-ordered treatment programs is sufficient, in the absence of other evidence, to support a finding that a return to parental custody would create a substantial risk of detriment to the child. Since court-ordered treatment programs are tailored by the court to remedy the circumstances that required removal of the child from parental custody, it is reasonable to conclude that in the absence of contrary evidence the failure to participate in such programs is sufficient to establish that the circumstances still exist. (See *In re Audrey D., supra,* 100 Cal.App.3d at pp. 44-45.) This is sufficient to uphold the use of the presumption. (See *Ulster County Court* v. *Allen* (1979) 442 U.S. 140, 164-166 [60 L.Ed.2d 777, 796-797, 99 S.Ct. 2213]; *Tot* v. *United States* (1943) 319 U.S. 463, 467 [87 L.Ed. 1519, 1524, 63 S.Ct. 1241].)

The decisions relied upon by the father are inapposite. In *Stanley* v. *Illinois, supra,* 405 U.S. 645 [31 L.Ed.2d 551], the state conclusively presumed that an unmarried father was unfit to have custody of his children and thus upon the mother's death took custody from him without permitting a hearing on parental fitness. The court concluded that the father was entitled to a hearing. (*Id.* at pp. 657-658 [31 L.Ed.2d at p. 562].) In *Bell* v. *Burson* (1971) 402 U.S. 535 [29 L.Ed.2d 90, 91 S.Ct. 1586], the state suspended the driver's license of a person involved in an accident who failed to post security for potential damages. The court held that since under the state's

law liability was an important factor in the suspension of a driver's license, the driver was entitled to a hearing and a showing of a reasonable possibility of liability before suspension of his license. (*Id.* at pp. 541-543 [29 L.Ed.2d at p. 96].) In *Carrington* v. *Rash* (1965) 380 U.S. 89 [13 L.Ed.2d 675, 85 S.Ct. 775], the state refused to permit military personnel to register to vote if they established their domicile after joining the military. The court held that the state could require a showing of bona fide residence as a requisite for voting, but could not conclusively presume that military personnel were not bona fide residents. (*Id.* at p. 96 [13 L.Ed.2d at p. 680].)

The constitutional flaw in each of these situations was in the use of a conclusive presumption based upon predicate facts which did not necessarily establish the ultimate fact. In contrast, the presumption in section 366.21, subdivision (f), is not conclusive, does not shift the burden of proof to a parent, and upon the introduction of any contrary evidence has no further effect in the action. (Evid. Code, § 604.) For these reasons we conclude that the use of such a device is not constitutionally prohibited.

IV

SUFFICIENCY OF THE EVIDENCE

██ The father finally contends that the evidence at the 12-month review hearing was insufficient to support either the finding that reasonable reunification services were offered or the decision to deny visitation pending the hearing under section 366.26.

██ Initially, we note that these contentions may not be made in an appeal from an order terminating parental rights under section 366.26. Subdivision (k) of that section provides: "An order by the court directing that a hearing pursuant to this section be held is not an appealable order, but may be the subject of review by extraordinary writ." In *In re Rebecca H.* (1991) 227 Cal.App.3d 825, at pages 835 through 837 [278 Cal.Rptr. 185], the court concluded that an order denying reunification services and scheduling a hearing under section 366.26 can be reviewed only by a timely petition for an extraordinary writ and not by means of an appeal. In *In re Taya C.* (1991) 2 Cal.App.4th 1, at pages 6 through 9 [2 Cal.Rptr.2d 810], the court upheld this procedure against due process and equal protection arguments. Pursuant to these decisions Heather's father cannot now obtain appellate review of the reunification findings made at the earlier review

hearing.[16] And, our affirmance of the order terminating parental rights will render questions of interim visitation moot. (See § 366.26, subds. (h), (i).)

In any event, we find the evidence sufficient. ▉ Appellate review of the sufficiency of the evidence employs the substantial evidence test by which we review the record in a light most favorable to the judgment and must uphold the trial court's findings unless it can be said that no rational factfinder could reach the same conclusion. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576-577 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

▉ At the time of the continued 12-month review hearing Heather had been removed from her father's custody for nearly 17 months. During that time the father had done virtually nothing to regain custody of Heather. He was supposed to maintain weekly visitation, but had visited only twice and had not visited at all for nearly a year. He failed to maintain regular contact with the social worker or to keep her informed of his whereabouts. He did not participate in any parenting classes, substance abuse or substance testing programs. He did not undergo a psychological examination as required. The social worker testified that the father was referred to these services but failed to participate. On questioning by the father she denied that participation in a substance abuse program was made a condition of visitation, but she did say that she urged him to participate in such a program when he called her about visitation.

The father testified that on eight or nine occasions he inquired about visitation but was told he would have to go through a substance abuse program first. He attempted to go to the county substance abuse program but could not pay for it and after the court authorized payment they would not take him back. The social worker failed to refer him to another program. With respect to the other requirements in the reunification plan, such as parenting classes, the father concluded that he did not need the services.

The father's testimony created a conflict in the evidence with respect to some of the facts asserted by DSS. However, those conflicts were resolved against the father by the trial court and cannot serve as a basis for reversal on appeal. (*People* v. *Johnson, supra,* 26 Cal.3d at pp. 576-577.) Moreover, taken at face value the father's testimony shows only that he made some

---

[16]This question is now pending in the Supreme Court in *In re Matthew C.* (1992) 3 Cal.App.4th 249 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], review granted April 23, 1992 (S025565), and *Cynthia D.* v. *Superior Court, supra,* 3 Cal.App.4th 913, review granted April 23, 1992 (S025807). Review was denied in *In re Taya C., supra,* 2 Cal.App.4th 1 on April 23, 1992.

minimal efforts with respect to some of the requirements of his reunification plan but made no efforts with respect to most of the requirements. Such evidence does not compel the conclusion that no reasonable trier of fact could find as the trial court did and thus we cannot disturb the trial court's findings.

## DISPOSITION

The order of the juvenile court is affirmed.

Davis, J., and Scotland, J., concurred.

A petition for a rehearing was denied October 8, 1992, and appellant's petition for review by the Supreme Court was denied November 24, 1992.