Filed 11/8/13  In re J.P. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.P., a Person Coming Under the Juvenile Court Law. | H039300 (Santa Clara County Super. Ct. No. JD21424) |
| SANTA CLARA COUNTY DEPART. OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. J.P. et al., Defendants and Appellants. | |

Mother M.L. and father J.P. (collectively, parents) appeal the juvenile court's judgment finding jurisdiction over their infant son J.P.[1] pursuant to Welfare and Institutions Code section 300, subdivisions (a) and (b).[2]  Father separately appeals the juvenile court's dispositional order terminating father's physical custody of J.P. pursuant to section 361, subdivision (c)(1).  For the reasons stated here, we find that substantial evidence supports the juvenile court's jurisdictional and dispositional findings, and we will affirm the orders.

---

[1]  Further references to J.P. are to parents' son, not to father.

[2]  Unspecified statutory references are to the Welfare and Institutions Code.

# I. FACTUAL AND PROCEDURAL BACKGROUND

On September 13, 2012, at around 10:00 p.m., parents picked up four-month-old J.P. from his maternal grandparents' house and took him to father's duplex in San Jose. When they picked up J.P., neither the parents nor the maternal grandparents reported seeing any injuries to J.P. When they went to bed, mother placed J.P. in a playpen located next to parents' bed. Mother stated she slept on the bed directly next to the playpen and father slept on the bed on her other side.

Mother woke up around 4:30 a.m. to feed J.P. She stated he was crying but she did not notice any injuries because it was dark. Around 7:00 a.m. the next day, September 14, mother saw a mark on J.P.'s cheek. Around noon that day, after taking off the "onesie" J.P. had been wearing, parents noticed marks on his upper left arm. J.P. was in parents' sole custody and care between picking him up from the maternal grandparents' house and the discovery of the marks.

Upon discovering the marks, mother took pictures of them. Parents returned to J.P.'s maternal grandparents' house that evening to show the maternal grandmother. While there, J.P.'s maternal aunt saw photos mother had taken of his injuries and, believing they were inflicted by father, reported the matter to the authorities. In the early morning of September 15, police arrived at the maternal grandparents' house in response to the child abuse report. Officer Stacy Thoni of the San Jose Police Department noted in a police report that she found J.P. "with a bruise and two arching red marks (possible bite marks) on his left shoulder, and two arching red marks on his right cheek." The cheek marks were each approximately one inch long and were faint when Officer Thoni viewed them. The marks on J.P.'s left shoulder were one to one and one-half inches long and accompanied by a bruise of one and one-half inches in diameter.

When asked by the police how J.P. sustained the injuries, parents did not have an explanation. Officer Thoni's report indicated mother informed her the injuries might have been caused by "some sort of ghost, spirit, or demon . . . ." The other responding

officer, Officer Brum, stated in his report that father provided a similar explanation and told the officer he had not taken J.P. to the hospital because he feared he would be accused of child abuse. The officers allowed J.P. to remain with the parents pending further investigation. At the time of the incident, father was 19 and mother was 18.

In response to a referral from the police, emergency response social worker Thuy Tran of the Santa Clara County Department of Family and Children's Services (Department) visited the parents later on September 15. After interviewing the parents, Tran suggested they take J.P. to the hospital. Parents took J.P. to a Kaiser hospital on September 15, where he was treated by a number of physicians, who reported that he had a scratch on his face. As for the arm injury, the doctors agreed it was most likely caused by a human bite. One doctor opined it was probably child-sized while another could not determine whether the bite was from an adult or a child. The doctors also performed a skeletal survey and a CT scan of J.P.'s head and found no additional injuries or abnormalities.

On September 19, Dr. Melissa Egge, a child abuse expert retained by the Department, examined J.P. Dr. Egge had previously reviewed photographs of the injuries on J.P.'s face and arm and concluded with a high degree of certainty that all of the injuries were the result of adult-sized bites. Dr. Egge based her conclusion on a scholarly article from 1986 regarding bite mark evidence, which, according to Dr. Egge, stated that bite marks with a diameter of three centimeters or more were most likely caused by an adult. When she measured the bite marks in the photographs, she determined they were "about three centimeters across or more . . . ."

During the Department's investigation, father disclosed that he was briefly hospitalized shortly after J.P.'s birth in May 2012 due to a psychiatric incident. He signed a release allowing the Department access to the medical records from that hospitalization. During that incident, father reported seeing a black orb while he was in a room with mother and J.P. and that he heard a voice say "I want your baby and I want

you gone." Father reported the incident to mother and the maternal grandparents, who took him for treatment. He was admitted to the hospital for approximately five hours and diagnosed by a licensed clinical social worker with temporary psychosis, not otherwise specified, as well as major depression and anxiety disorder.

Importantly, father reported to the doctor at the time of the psychiatric incident that he blacked out for a moment and awoke to find himself preparing to squeeze J.P.'s head but stopped short of carrying out the act after hearing his deceased grandmother tell him not to harm J.P. Father also told the licensed clinical social worker that he used to take medication to treat Tourette's syndrome but had stopped taking the medication because of unpleasant side effects. When asked whether he would harm J.P., father responded "I will never hurt him. He's my son." Following the psychiatric incident, father met with a licensed clinical social worker on two or three occasions for psychiatric therapy.

Apart from the possibility of paranormal activity, two other explanations were suggested for J.P.'s injuries. First, parents noted that J.P. might have been bitten by another child while in the care of his paternal grandmother. His paternal grandmother took J.P. to Chuck E. Cheese's on September 13 with a two- or three-year old girl who, "according to [paternal grandmother], has a known history of biting." However, in an interview with Department social worker Heather McIntosh, the paternal grandmother stated that she did not believe the girl had an opportunity to bite J.P. Moreover, the paternal grandmother informed McIntosh that the manager of the restaurant had reviewed the security video at her request and did not observe J.P. being bitten. Although the video did not show J.P. being bitten, father told McIntosh there were two periods where J.P. was not being recorded. Second, J.P.'s paternal grandmother told McIntosh that J.P. might have been injured by using a new rope swing she had installed in her doorway. When asked whether this was a realistic possibility, however, Dr. Egge stated that the marks were "not consistent with an infant swing injury."

As a result of Tran's initial investigation and Dr. Egge's examination of J.P., the Department filed a juvenile dependency petition in the Santa Clara County Superior Court on September 19. The petition alleged that J.P. suffered, or was at substantial risk of suffering, serious physical harm inflicted nonaccidentally by his parents (§ 300, subd. (a)) and that he suffered, or was at substantial risk of suffering, serious physical harm or illness as a result of any of the following: (1) the failure or inability of his parents to supervise or protect J.P.; (2) the willful or negligent failure of J.P.'s parents to supervise or protect him from the conduct of a custodian with whom he was left; or (3) the inability of father to provide regular care for J.P. due to father's mental illness (§ 300, subd. (b)). The Department also sought a warrant to remove J.P. temporarily from parents' custody. The juvenile court detained J.P. on September 24 and placed him with his maternal grandparents.

In October 2012, the Department filed a second amended juvenile dependency petition.[3] The second amended petition removed references to injuries J.P. had reportedly sustained in June 2012. It also integrated allegations, based on the opinion of Dr. Egge, that the injuries J.P. sustained between September 13 and September 14 were "indicative of inflicted trauma." The allegations continued that, because parents were J.P.'s sole caretakers during that period, the presumption of section 355.1 - that J.P. "sustained injuries of such a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of [J.P.'s] parents" - applied to make J.P. subject to dependency jurisdiction.

The Department prepared a social worker jurisdiction report and a series of four addenda detailing its investigation. The initial report and the first two addenda recommended dismissing the dependency petition without prejudice and helping the family through informal supervision. In the third addendum, however, the Department

---

[3] The Department had previously filed a first amended petition not relevant to this appeal.

changed its recommendation to a finding of jurisdiction based on Dr. Egge's opinion regarding J.P.'s injuries. While the third addendum recommended that the juvenile court assume jurisdiction over J.P., the Department continued to recommend a disposition involving joint custody and informal supervision. The recommendation of informal supervision rather than family maintenance was based in part on the high level of cooperation the parents had displayed throughout the process. The third addendum reported that while parents had not had complete compliance with recommended case plan services, their incomplete compliance was at least partially attributable to the parents' efforts to find full-time employment as well their handling of a miscarriage mother reportedly suffered in November 2012.

The fourth addendum recommended even greater supervision. That addendum recommended a finding of jurisdiction and formal family maintenance supervision due to two changed circumstances discovered by the Department. The first was heightened familial conflict in both extended families as well as an incident of domestic violence between parents in December 2012 that involved pushing and the possible slapping of mother by father. Although neither parent sustained serious injuries, there was no police involvement, and J.P. was not present during the altercation, McIntosh wrote that the incident "reflects the instability of the parents' relationship, which ultimately poses a risk for [J.P.] in the future."

The second change leading to the amended recommendation was the parents' "great difficulty in engaging in services." While both parents had previously expressed interest in complying with recommended services such as parenting classes, "their compliance with recommended services has not been consistent with their verbal intentions." In sum, while McIntosh noted that the parents had been cooperative, she felt "Court intervention will help the parents to follow through with these services that are in place to ensure [J.P.'s] safety in the future." Despite these changed circumstances, however, the Department still recommended that both parents retain custody of J.P.

During the combined jurisdiction and disposition hearings, which took place in January and February 2013, the court heard testimony from multiple witnesses, including Dr. Egge, who was qualified as an expert witness in the fields of child abuse and skin findings, and McIntosh, who was qualified as an expert witness in child abuse, risk assessment, and the placement of dependent children. These experts restated and explained the opinions contained in the social worker reports and addenda. At the close of evidence, the juvenile court allowed each party to provide arguments regarding jurisdiction. Mother and father were separately represented and both argued that the court should not exercise jurisdiction over J.P. Regarding J.P.'s injuries, the parents argued the Department had not shown by a preponderance of the evidence that they were due to any action or negligent supervision by the parents. Father also argued the bites were likely the result of the child who had accompanied the paternal grandmother and J.P. to Chuck E. Cheese's on September 13, which was consistent with one Kaiser doctor's opinion that the bites were child-sized. Minor's counsel argued that the court should accept Dr. Egge's expert testimony, that the evidence supported the section 355.1 presumption, and that parents had not overcome the presumption. The Department's arguments in favor of jurisdiction were generally in line with those made by J.P.'s attorney.

After hearing arguments from counsel, the juvenile court amended allegations a-4 and b-4 of the second amended petition to conform to proof so that they read: "Further, Dr. Melissa Egge opines that the four-month old child's injuries are indicative of inflicted trauma *in the form of adult bite marks*." (Italics noting handwritten interlineation.) As amended, the court found the allegations of the second amended petition true and assumed jurisdiction over J.P. The court explained that the jurisdictional decision was "based on all of the evidence, the testimony that was received, the evidence that was received during the trial, as well as everything that was documented in the reports that had been admitted . . . ." Additionally, the court stated that it found "Dr. Egge to be a

credible, competent expert witness whose testimony and opinion the Court greatly relied *[sic]* and found to be most significant, most helpful and compelling." In making its jurisdictional determination, the court did not mention the section 355.1 presumption.

Turning to disposition, the juvenile court first had a chambers conference off the record. After the conference, the court indicated on the record that a chambers meeting had occurred and that its tentative decision was to remove custody from the father. It did not, however, explain the reasoning behind the tentative decision. The court then allowed the parties to make arguments regarding disposition. Mother, father, and the Department urged the court to adopt the recommendations of the fourth addendum, which called for formal family maintenance supervision with custody to be retained by both parents. Minor's counsel recommended removing J.P. from both parents due to the substantial risk of future harm "by biting or other punitive measures . . . [¶] [a]t the hands of these parents."

After hearing the parties' arguments, the court removed J.P. from father's physical custody and ordered that mother retain custody under the Department's family maintenance supervision. The court also ordered that father receive services from the Department's family reunification program as well as a psychological evaluation. Finally, the court granted father supervised visits with J.P. at a least two times per week.

## II.   DISCUSSION

Two issues are raised on appeal, which we will address in turn: (1) whether substantial evidence supported the juvenile court's assumption of jurisdiction pursuant to section 300, subdivisions (a) and (b); and (2) whether substantial evidence supported the trial court's dispositional finding removing custody from father pursuant to section 361, subdivision (c)(1).[4]

---

[4] The parties make various arguments related to the applicability of the presumption contained in section 355.1. In finding jurisdiction over J.P., however, the juvenile court made no mention of section 355.1 or the requisite findings of *(continued)*

### A. JURISDICTIONAL FINDINGS (§ 300, SUBDS. (A) & (B))

We review a court's jurisdictional findings for substantial evidence. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.) "Substantial evidence is evidence that is 'reasonable, credible, and of solid value;' such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199, quoting *In re Angelina P.* (1981) 28 Cal.3d 908, 924.) "[A]n appellate court defers to the trier of fact on [factual] determinations, and has no power to judge the effect or value of, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence. We review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses." (*Ibid.*)

The juvenile court established jurisdiction over J.P. pursuant to both subdivision (a) and subdivision (b) of section 300.

#### 1. Section 300, Subdivision (a)

To adjudge a minor a dependent child pursuant to subdivision (a), a court must find that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." (§ 300, subd. (a).)

The evidence before the juvenile court established that no caregiver saw any marks or injuries on J.P. when parents picked him up on the evening of September 13 and

---

subdivision (a). References to section 355.1 are likewise absent from the order, prepared by the Department after the hearing, summarizing the court's jurisdiction and disposition findings. On appeal, mother contends that the juvenile court did not rely on the presumption of section 355.1 when assuming jurisdiction over J.P. and that we should, therefore, only review the jurisdictional finding under section 300. Because the record is unclear, we will proceed under the assumption that the court did not rely on section 355.1. (See *In re Sheila B.* (1993) 19 Cal.App.4th 187, 200, fn. 7 ["Since the juvenile court never made the finding required by this section, this presumption never came into play."].)

took him to father's residence. Parents both indicated that J.P. was in their sole custody between picking him up on the 13th and the discovery of the marks on his cheek the next day. Dr. Egge unequivocally stated her expert opinion that the marks on J.P.'s cheek and arm were made by an adult. Although the identity of the specific individual who inflicted the injuries was not determined, the Department provided substantial evidence that either mother or father was responsible for J.P.'s injuries. Further, substantial evidence supported a finding of substantial risk of future harm because, though parents had been cooperative, they had not followed through with all requested services recommended by the Department, including completing a parenting without violence class.[5] Substantial evidence supported the juvenile court's jurisdictional determination pursuant to section 300, subdivision (a).

Evidence relied on by parents in their appellate briefing does not change this result. Parents emphasize that J.P. was wearing an outfit that covered his arms all day on September 13 that was not removed until mother's discovery of his injuries on September 14. Based on this, parents suggest that J.P.'s injuries could have been sustained at an earlier time while he was in the custody of another caregiver, such as his paternal or maternal grandmother. However, regardless of when J.P.'s outfit was changed, there was no evidence to suggest that anything he was wearing would have covered the injury he sustained on his cheek, an injury that no one reported seeing until the morning of September 14.

---

[5] We note with some concern that the Department's appellate characterization of parents' cooperation and compliance with recommended services borders on misrepresenting the record. At pages 37 and 38 of its Respondent's Brief, the Department claims parents "ignored" the Department's referrals for services and that parents took no corrective action to prevent future harm to J.P. However, these statements are contradicted by the Department's own third and fourth addendum reports in the record, which describe parents' cooperation and efforts to take corrective action, including participating in a family conference with the Department and agreeing to attend a parenting without violence class. While parents' compliance with recommended services was indeed not perfect, the Department's argument goes too far on this record.

As for parents' related explanation that J.P. might have sustained the injuries at Chuck E. Cheese's, the juvenile court had ample evidence to find the explanation unreasonable. The paternal grandmother, who had taken J.P. and a female toddler to the restaurant, stated that she did not believe the girl had bitten J.P. Additionally, the surveillance video from the restaurant reportedly showed no instance where the toddler or any other individual bit J.P., though there were apparently two periods of time where J.P. was not in the range of the camera. Finally, Dr. Egge testified with a high degree of certainty based on a scholarly study on bite mark identification[6] that the injuries J.P. sustained were the result of adult-sized bites, undermining parents' theory that a child bit J.P. Although at least one doctor who treated J.P. on September 15 opined in his report that the bite on J.P.'s arm appeared to be child-sized, the juvenile court was entitled to rely on the expert testimony of Dr. Egge that contradicted the other doctor's opinion. Such credibility determinations are the province of the trial court.

### 2. Section 300, Subdivision (b)

The juvenile court found true the allegations in the second amended petition that a jurisdictional finding pursuant to section 300, subdivision (b), was warranted for J.P. because J.P. had suffered, or was at a substantial risk of suffering, serious physical harm or illness due to each of the following: (1) parents' failure or inability to adequately supervise or protect J.P.; (2) parents' failure or inability to adequately supervise or protect J.P. from the conduct of other custodians; and (3) father's inability to provide regular care for J.P. due to his mental illness.

The same substantial evidence that supported a jurisdictional finding under section 300, subdivision (a), supported a jurisdictional finding of parents' failure or inability to

---

[6] In his opening brief, father attacks Dr. Egge's reliance on the 1986 study, citing newspaper articles (without requesting judicial notice) suggesting the findings of the study are no longer accurate. Father's arguments, however, should have been made below because we have no power to reweigh the evidence on appeal. (*In re Sheila B., supra,* 19 Cal.App.4th at p. 199.)

supervise or protect J.P. As determined by the juvenile court, J.P. suffered multiple adult-sized bites while in the exclusive custody of his parents between September 13 and September 14. The failure of parents to prevent J.P. from sustaining these injuries shows an inability to protect him. Regarding current risk of harm at the time of the jurisdictional hearing, which is required to find jurisdiction under section 300, subdivision (b), (*In re J.N., supra,* 181 Cal.App.4th at p. 1023), the juvenile court was entitled to rely on the Department's reports, which noted that parents had failed to attend and complete parenting without violence classes. The September 2012 injuries, the parents' failure to take responsibility for them, and the parents' failure to complete recommended services provided the juvenile court with substantial evidence to support a finding of failure or inability to supervise.

Turning to the allegation specific to father, the juvenile court determined that father's major depression and anxiety disorder, as well as his brief psychiatric hospitalization in May 2012 for auditory and visual hallucinations, supported jurisdiction. According to father's psychiatric records as well as his statements to police and social workers, in May 2012, shortly after J.P.'s birth, father saw a dark figure enter the room occupied by father and J.P. Father heard a voice say "I want your baby and I want you gone." Father then blacked out momentarily before awaking to find himself preparing to squeeze J.P.'s head. Father declined to carry out the act after hearing his deceased grandmother tell him not to harm J.P. After the incident, father attended two or three counseling sessions with a licensed clinical social worker.

From the foregoing, the juvenile court had substantial evidence to support its conclusion that J.P. was at substantial risk of suffering serious physical harm or illness as a result of father's inability to provide regular care for J.P. due to father's mental illness. While the presence of a mental illness in a parent will not trigger a jurisdictional finding pursuant to section 300, subdivision (b), if there is no nexus between the illness and a risk of harm to the child, here father stated he found himself about to squeeze J.P.'s head after

experiencing hallucinations. This provided a direct nexus that supports jurisdiction. Further, the Department's risk assessment expert Ms. McIntosh suggested that father's mental illness posed a continuing risk to J.P. when she opined that, absent a counselor's statement that father did not need further treatment, father's attendance at two or three counseling sessions was inadequate. Substantial evidence supported the juvenile court's jurisdictional finding relating to father's mental illness.

## B. DISPOSITIONAL FINDINGS (SECTION 361, SUBD. (C)(1))

Father challenges the juvenile court's decision to remove custody. We review a juvenile court's dispositional findings for substantial evidence. (*In re J.N., supra,* 181 Cal.App.4th at p. 1022.)

After an unrecorded chambers conference, the juvenile court returned J.P. to mother's custody subject to formal family maintenance. In removing J.P. from father's custody, the court paraphrased section 361, subdivision (c)(1), when it made the following dispositional findings on the record: "By clear and convincing evidence, the welfare of the child requires that his physical custody be taken from the father . . . with whom the child was residing when the petition was initiated as there is or would be substantial danger to the physical health, safety, protection, or physical or emotional well being of the minor if the minor were returned home to his father's care, and there are no reasonable means by which the minor's physical health can be protected without removing the child from father's physical custody."

Substantial evidence supported the juvenile court's dispositional finding. The juvenile court found true the second amended petition's allegation that J.P.'s injuries occurred when he was in the exclusive care of his parents. Additionally, although the Department recommended that father retain custody of J.P. with mother, its fourth addendum report disclosed an incident of domestic violence between parents, during which father allegedly slapped mother. During her testimony, the risk assessment expert Ms. McIntosh indicated the presence of domestic violence created a risk of harm to J.P.

Given father's history of witnessing domestic violence as a child, McIntosh explained that he was at a higher risk of carrying out domestic violence himself, which created further risk of harm to J.P.

The most compelling evidence supporting the juvenile court's dispositional order was father's unresolved mental health issues. McIntosh stated that one concerning aspect of father's mental health records was his statement that "he, for a moment, felt like squeezing [J.P.'s] head . . . ." That statement, along with McIntosh's opinion that father needed additional therapy to resolve his mental health issues and the lack of any expert testimony that father's mental health was no longer a concern, supported the court's finding that father was a substantial danger to J.P.'s physical and emotional health, safety, protection, and well-being. (§ 361, subd. (c)(1).)

### III.    DISPOSITION

For the foregoing reasons, the juvenile court's jurisdictional and dispositional orders are affirmed.

_____

Grover, J.

**WE CONCUR:**

_____

Premo, Acting P.J.

_____

Mihara, J.